UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald Glen SHAW,
Defendant-Appellant.

No. 82–4097.

United States Court of Appeals,
Fifth Circuit.

March 15, 1983.

Robert L. Doyel, University of MS School of Law, University, Miss., for defendant-appellant.

Glen H. Davidson, U.S. Atty., John R. Hailman, Alfred E. Moreton, III, Asst. U.S. Attys., Oxford, Miss., for plaintiff-appellee.

Before CLARK, Chief Judge, RUBIN and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

Ronald Glen Shaw was convicted by a jury of five federal offenses: (1) receiving a firearm after earlier being convicted of the felony of rape and assault with intent to rape, in violation of 18 U.S.C. § 922(h); (2) first degree murder of Terrell Johnson, Jr., in violation of 18 U.S.C. § 1111; (3) carrying a firearm unlawfully and using it to kill Terrell Johnson, Jr., in violation of 18 U.S.C. § 924(c); (4) assault with intent to murder Lachelle Johnson, in violation of 18 U.S.C. § 113; and (5) carrying a firearm unlawfully and using it in the assault of Lachelle Johnson, in violation of 18 U.S.C. § 924(c). He was sentenced to life impris-

onment plus twenty-one years. On appeal, Shaw alleges numerous errors: (1) the rifle found in his pickup truck was discovered as the result of an illegal search; (2) various statements were obtained from him in violation of his right to counsel; (3) his right to a fair trial was prejudiced by a pattern of prosecutorial misconduct, including comments on his right to remain silent, use of character evidence to prove he committed the crime in question, and improper statements during closing argument; (4) there was insufficient evidence to support the jury's verdict of premeditated murder; (5) the trial court's supplemental jury instructions were erroneous, and (6) counts in the indictment were multiplictous and should have been dismissed. Following an exhaustive review of the record, we conclude that Shaw's contentions are without merit. We affirm his conviction on all counts.

## FACTS

Late Christmas night, 1980, Kenneth Brinkley was driving his automobile down a secluded two-lane highway in the sparsely populated area of Mississippi known as the Natchez Trace Parkway.[1] With him in the car were his son, his fiancé, Linda Johnson, and her children, twelve-year-old Lachelle and nine-year-old Terrell Johnson. The three children were sleeping in the back seat. While passing the Ballard Creek rest area, Brinkley noticed a parked pickup truck, which appeared to be a dark-colored, red and white late model Ford with chrome trim on the side. Brinkley had seen no other vehicles on the road. Immediately after Brinkley passed the rest area, a rifle shot ripped through the car's back seat. The bullet struck the young Johnson boy in the legs and hit his sister in the hip.

Brinkley quickly sought help in the nearby town of Mathiston, telling the local police where the shooting had taken place and describing the pickup he had seen in the Ballard Creek rest area immediately prior to the shooting. Relying on this information, three officers proceeded to the Trace Highway about a half mile north of the rest area. After waiting approximately ten or fifteen minutes they saw a late model, two-tone pickup approaching from the south at 35 to 40 miles per hour. Shaw was apprehended in the truck after a chase in which speeds exceeded 110 miles per hour. Shaw was frisked and told his vehicle fit the description of one at the scene of the shooting. He was arrested for speeding and driving while intoxicated, handcuffed, and placed in a patrol car.

After Shaw got out of the truck, one of the officers shined a light through its open door and saw four bullets on the floor on the driver's side. Another officer then released the seat latch and folded back the driver's seat. Behind the seat, fully cocked, was a .35 caliber rifle. Shaw was read his *Miranda* rights and told of the traffic charges. He made no statement to police. Shaw was then driven to the sheriff's office in Ackerman, Mississippi. After he was again read his *Miranda* rights, he indicated that he wished to answer questions. Shaw told the sheriff that he had been "driving around" on the Natchez Trace Highway and stopped at "a pull-off place" because he was sick. He emphatically denied that he had fired his gun since deer hunting that afternoon.

Later that same night young Terrell Johnson died of his wounds. The next day, Friday, December 26, Shaw was questioned by FBI agents. He repeated his story that he did not load or fire his rifle after dark on Christmas Day. That night, a janitor at the hospital discovered in the hospital treatment room the bullet which had struck the two children. Saturday afternoon, December 27, FBI agents interviewed Shaw again. The agents showed Shaw the battered slug, and told him that ballistic tests were going to be performed on the bullet. Shaw then stated that he would answer no more questions without having an attorney present, and the interview was terminated. Shaw's parents were told that a ballistic report would be received by Monday morning, the 29th.

---

1. The Natchez Trace Parkway is a federal highway reservation in the Northern District of Mississippi, under the concurrent jurisdiction of Mississippi and the United States.

Around 10:30 a.m. Monday, Shaw's parents called one of the agents and said that their son wanted to talk to him. The agent responded that he could not speak to Shaw because Shaw had requested an attorney. The parents insisted, and the FBI agent went to see Shaw in person, accompanied by another agent. At this point, the ballistic report had been received. It indicated conclusively that Shaw's rifle had been the one to fire the shot. The agents readvised Shaw of his rights. Shaw explained that he, not his parents, wanted the agents to hear the story. The agents had Shaw carefully study a written *Miranda* waiver, which he signed. The agents then agreed to listen to Shaw's story. Shaw said that his earlier statement was false, that on Christmas night he had been "headlighting deer" from the Pigeon Roost rest stop, and while walking into the woods north of the area he had slipped and fallen, causing his gun to go off as it hit the ground. He saw the car pass, and worried that he had hit it, but because the car seemed to be proceeding normally, he assumed that it had not been hit. He then went back to his truck, waited a few minutes, and began driving on the Trace Highway where he was stopped by the state police.

On December 30, the sheriff filed a state complaint for first degree murder of Terrell Johnson. Following appointment of counsel and a preliminary hearing on January 12, 1981, Shaw was bound over to the federal grand jury, and on January 29, indicted.

At the conclusion of trial, the jury found Shaw guilty on all counts. His motions for judgments of acquittal and for a new trial were denied, and he was sentenced to imprisonment for life, plus twenty-one total years for the other offenses. This appeal follows.

## I. SEARCH OF VEHICLE

### A. At Time of Apprehension

Shaw's first contention is that the district court erred in not suppressing as evidence the rifle and shells seized by the officers from his pickup during the initial stop on the night of December 25, 1980.

It is a cardinal principle of Fourth Amendment jurisprudence that searches conducted outside the judicial process of obtaining a warrant are *per se* unreasonable, except those conducted in a few narrowly defined situations. The exceptional situations are those in which "the societal costs of obtaining a warrant, such as danger to law officers or risk of loss or destruction of evidence, outweigh the interest of recourse to a neutral magistrate." *Arkansas v. Sanders,* 442 U.S. 753, 759, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (1979); *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). Predicated on this "exigent circumstances" rationale is the so-called "automobile exception", first articulated by the Supreme Court in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In *Carroll,* the Supreme Court held that a warrantless search of an automobile on a highway is not unreasonable within the meaning of the Fourth Amendment so long as the police have probable cause to believe that the "contents of the automobile offend against the law". *Id.* at 159, 45 S.Ct. at 287.

Recently, in *United States v. Edwards,* 577 F.2d 883 (5th Cir.) (en banc), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978), this Court stated that probable cause to search an automobile exists when "trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband." *Id.* at 895. We stressed that probable cause is the "sum total of layers of information and the synthesis of what police have heard, what they know, and what they observed as trained officers." *Id., quoting Smith v. United States,* 358 F.2d 833, 837 (D.C.Cir.1966), *cert. denied,* 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967). Each individual layer of information is not to be weighed. Rather, the "laminated total" of the facts available is the source of the justification for a vehicle search without a warrant. *United States v. Edwards, supra,* 577 F.2d at 895, *quoting*

*Smith v. United States, supra,* 358 F.2d at 837; *Doescher v. Estelle,* 666 F.2d 285, 289 (5th Cir.1982).

Shaw argues that the totality of the circumstances known to the officers prior to the time the driver's seat of the truck was pulled back and the gun was discovered did not rise to the level of reasonable belief. Examining the information known to the police prior to the search, we aggregate the critical facts. The police officers proceeded to the Natchez Trace Highway approximately 20 minutes after a reported sniper shooting had occurred near the Ballard Creek rest stop. They were relying on Mr. Brinkley's report that he had seen a late model two-tone Ford pickup with chrome on the side and which appeared to be red and white, parked on the side of the road with its lights off, immediately before the shooting. The officers knew that the Natchez Trace is an isolated highway of limited use; large trucks are banned on the road and there is virtually no traffic on the unlit highway late at night.

■ Moments after reaching an area approximately 300 yards north of the site from which Brinkley said the shot had been fired, the officers observed, proceeding toward them from the direction of the Ballard Creek rest stop, a late model "brown" or "maroon and white" two-tone Ford pickup, travelling at an "unusually slow rate of speed."[2] No other vehicle was seen on the highway. One of the policemen recognized the driver as Shaw, whom he knew had recently been released from jail on a rape conviction. The pickup rapidly accelerated

and the police gave chase. Shaw stopped three miles later when the police overtook the vehicle and signalled the driver to stop. Shaw got out of the cab of the pickup at the police's request. Through the door Shaw had left open as he exited the truck, one of the officers saw in plain view several live .35 caliber rifle shells on the floor of the truck. There is no contention that these shells were not validly seized.[3] Whether the "sum total" of these "layers of information" to this point justified an actual search of the truck is the question before us.[4]

■ Shaw contends that because the truck he was driving was dark brown and beige, rather than the red and white described by Brinkley and Mrs. Johnson, that the police necessarily lacked the probable cause on which to predicate the search. We must disagree. Photographs of the truck reveal it to be a brown color, close to maroon in tone. One of the officers at trial, when asked to relate the color of the truck, described it as "dark red or maroon." Certainly this truck, illuminated by headlights on an otherwise dark highway, would reasonably be within the range of Mr. Brinkley's description.

Shaw relies heavily on *Dyke v. Taylor Implement Manufacturing Co.,* 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968). In that case, someone in a passing car had fired shots at the house of a non-striker during a labor dispute. A witness called police and described only a "kinda (sic) old make, model car". Shortly thereafter, the police observed a "suspicious" car, into

---

**2.** Testimony by the state officers at trial included descriptions of the truck as "dark red", "maroon", and "brown."

**3.** Seizure of evidence discovered in plain view by police officers acting within the scope of an otherwise justified intrusion does not constitute a Fourth Amendment violation. *Coolidge v. New Hampshire,* 403 U.S. 443, 469, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971); *Vance v. United States,* 676 F.2d 183, 189 (5th Cir.1982).

**4.** We note that the initial stop of Shaw's truck did not have to be justified· by "probable cause," but only that the officers must have had reasonable grounds to suspect that the vehicle had been involved in the crime. *Terry*

*v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). We have said that "reasonable suspicion" is to be determined by considering the totality of the circumstances, including the "collective knowledge" of all officers in assessing the facts. *United States v. Cimino,* 631 F.2d 57, 59 (5th Cir.1980); *United States v. Kreimes,* 649 F.2d 1185, 1189 (5th Cir.1981). Because we believe there is no doubt that the circumstances known to the police at the time they initiated their pursuit of Shaw clearly rose to the level of "reasonable suspicion", we have no cause to question the propriety of the initial stop.

which a shot had been recently fired, which then sped away. The police had not been informed that the car in question had been hit by a bullet. The police pursued the car, the driver was arrested for reckless driving, and the car was searched without a warrant after it was taken to the police station. The Supreme Court reversed the defendants' convictions and ruled that no probable cause existed to justify the warrantless search. In *Dyke,* the sum total of information available to the police was a description from a witness of an older model car, and the fact that the car they observed had sped up when pursued.

A recent decision of this Court is more directly analogous to the instant case than is *Dyke.* In *United States v. Edwards,* 577 F.2d 883 (5th Cir.) (en banc), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978), a defendant charged with possession of stolen mail was initially stopped by police for driving without a valid license. Prior to the stop, the police had been told that a person meeting the defendant's description had earlier been seen conversing with a woman suspected of stealing welfare checks from private mailboxes. When the defendant was first approached for questioning, he "acted suspiciously" and leaned down as if to hide something on the floor under the seat. At this point, the Court said, probable cause to search the car did not exist. The officers' "suspicions" were held to have "ripened into probable cause", however, when they saw several identification cards containing pictures of the suspected woman under different names. The cards were lying on the seat in plain view. *Id.* at 895–96.

■ There was a similar ripening here. The officers were informed there had been a sniper shooting on the Natchez Trace Highway. They saw a vehicle which closely matched the description given on the otherwise deserted highway. The driver of the vehicle initially drove off at high speed when the police presence became obvious. Finally, several live rifle shells were seen lying on the floor of the truck in plain view. The "laminated total" of facts within the knowledge of the police clearly was sufficient to warrant "men of reasonable caution", *Carroll v. United States, supra* 267 U.S. at 162, 45 S.Ct. at 288, to conclude that there was probable cause to believe that the pickup contained some evidence of the shooting. To hold otherwise would not serve the purposes of the Fourth Amendment, but rather would undermine its ultimate standard of reasonableness. *See Cady v. Dombrowski,* 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973). This was no haphazard or discriminatory stop. We find that the district court correctly ruled that the police had probable cause to believe Shaw's truck contained evidence of the crime, and we uphold denial of Shaw's motion to suppress.[5]

### B. After Impoundment

■ Shaw also argues that a search of his pickup on the morning of December 26, after the vehicle had been impounded, was improper. In this search, the sheriff seized one live round of ammunition, as well as napkins, beer cans and tangerine peels, which he wished to compare with similar items found earlier at Ballard Creek. Shaw claims that the exigent circumstances to justify the warrantless search of an auto under *Carroll* no longer existed once police had impounded his vehicle.

**5.** Because we have resolved that the warrantless search was justified by probable cause, we do not need to consider whether the search and seizure were also permissible as a search incident to a lawful custodial arrest. *See Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969); *New York v. Belton,* 453 U.S. 454, 462, 101 S.Ct. 2860, 2865, 69 L.Ed.2d 768 (1981) (warrantless opening of closed container found in car justified as search incident to arrest, even though occupant had been arrested and ordered outside of car so that container was no longer within his immediate control); nor do we need to consider whether the search was a valid inventory search. *See South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Prescott,* 599 F.2d 103, 105 (5th Cir.1979); *United States v. Edwards, supra,* 577 F.2d at 894–95 (examination of glove compartment, trunk, floor and area beneath seats prior to car's impoundment permissible as routine inventory search).

While *Carroll* may initially have been interpreted to limit a finding of inherent exigency to situations in which a car is stopped on a public highway, later decisions by the Supreme Court have abandoned such a limitation. In *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court held that police officers may conduct a warrantless search of a vehicle, even after it has been impounded, if there is probable cause to believe there is contraband inside the vehicle that had earlier been lawfully stopped on the road. *Accord, Texas v. White,* 423 U.S. 67, 68, 96 S.Ct. 304, 305, 46 L.Ed.2d 209 (1975). *In Michigan v. Thomas,* —— U.S. ——, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982), the Supreme Court summarily reversed the suppression of evidence found in an automobile's air vents. The Court stated:

> It is thus clear that the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.

*Id.* at 3081.

■ This Court disposed of the same argument in *United States v. Mitchell,* 538 F.2d 1230 (5th Cir.1976) (en banc) *cert. denied,* 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977):

> [T]he contention, that by the time of the search [the vehicle] had been immobilized, exigence had passed, and a warrant could have been obtained at leisure, is foreclosed by *Chambers v. Maroney* and *Cardwell v. Lewis* [417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325]. Both of these authorities

recognize that exigence is to be determined as of the time of the seizure of an automobile, not as of the time of its search; the fact that in these cases sufficient time to obtain the warrant had passed between each seizure and the corresponding search did not invalidate either."

*Id.* at 1232 (citations omitted). *See also United States v. McBee,* 659 F.2d 1302, 1305 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).[6]

Clearly, the rationale of *Chambers* and its progeny is not that an automobile maintains its mobility when parked at the police station, but rather that, given the scope of the initial intrusion caused by seizure of an automobile, there is no constitutional difference between the proper search on the highway and the later search at the station.[7] In the words of the Supreme Court, "for constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting a probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable." *United States v. Ross,* 456 U.S. 798, 807 n. 9, 102 S.Ct. 2157, 2163 n. 9, 72 L.Ed.2d 579 (1982), *quoting Chambers, supra,* 399 U.S. at 52, 90 S.Ct. at 1981.

We conclude that the critical evidence obtained by the two searches of Shaw's vehicle was properly acquired. Shaw's Fourth Amendment rights were not violated.

## II. Right to Counsel

Shaw next claims that the statement made by him to the FBI on Monday, December 29, was obtained in violation of his Sixth Amendment right to counsel. The statement made on the 29th contradicted

---

**6.** The search of Shaw's impounded truck can also be justified by the "inevitable discovery rule." *United States v. Wilson,* 671 F.2d 1291, 1294 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 98, 74 L.Ed.2d 89 (1982); *United States v. Brookins,* 614 F.2d 1037, 1042 n. 2 (5th Cir. 1980). Earlier the same day, Shaw had given FBI agents written permission to search his truck. It is uncontroverted that the items

seized by Mills would have been similarly found and seized by the FBI agents during the consent search.

**7.** Shaw attempts to distinguish Chambers by stressing that there the car was parked in the street of the police station and consequently still "mobile" while the impounded Shaw truck was not. This distinction is specious.

two earlier statements to police in which he denied having fired his gun on the night the child was killed. On the 29th, Shaw admitted that he had fired the shot that killed the child, but told the FBI agents that the shooting had occurred accidentally while he was "headlighting" deer.

■ A person comes under the protection of the Sixth Amendment's right to counsel at the time adversary judicial proceedings are initiated against him, "whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). Shaw makes lengthy arguments that the "prosecutorial forces" of the state had solidified against him so as to trigger Sixth Amendment protection at the time the county sheriff filed an affidavit charging him with murder under state law.

■ We note initially that Shaw predicates his claim on the Sixth, rather than the Fifth Amendment. Because "the policies underlying the two constitutional protections are quite distinct", *Rhode Island v. Innis,* 446 U.S. 291, 300 n. 4, 100 S.Ct. 1682, 1689 n. 4, 64 L.Ed.2d 297 (1980), Shaw is correct in arguing that a suspect may waive his Fifth Amendment right to the advice of counsel in deciding to remain silent without waiving his Sixth Amendment right to counsel. In determining whether the individual has been coerced to give evidence against himself, waiver will be examined within the context of evaluating whether the suspect's conduct indicates that his statements were made voluntarily. Accordingly, statements made in the absence of counsel in a conversation initiated by an accused may well not violate Fifth Amendment rights. *See Edwards v. Arizona,* 451 U.S. 477, 486 n. 9, 101 S.Ct. 1880, 1885 n. 9, 68 L.Ed.2d 378 (1981). Waiver of the Sixth Amendment right to legal assistance after formal adversary criminal process has begun mandates a different focus. *See Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). Because a Sixth Amendment violation is not dependent upon coercion, the protection of the Sixth Amendment is not waived by conduct showing that the defendant's statements were not coerced. The government must prove that the defendant knowingly and intelligently relinquished his right not to be questioned in the absence of counsel "after adversary proceedings had commenced." *Jordan v. Watkins,* 681 F.2d 1067, 1075 (5th Cir.1982). There must be proof of "an intentional relinquishment and abandonment" of the right. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

■ Under either a Fifth Amendment or Sixth Amendment claim, however, Shaw effectuated a valid waiver. *See Brewer v. Williams, supra,* 430 U.S. at 405–06, 97 S.Ct. at 1242–43. The FBI agents were reluctant to meet with Shaw in the absence of an attorney. They did so only upon the repeated requests of Shaw's parents, who implored the federal authorities to hear their son's story. Upon meeting with Shaw, the agents were told by Shaw that he, not his parents, was responsible for initiating the interview. They ascertained that Shaw, having been a college student, was fully capable of understanding his rights. They had Shaw carefully study a form explaining the waiver of his right to an attorney and carefully explained his right to an attorney under *Miranda.* Shaw signed the waiver of those rights. Although waiver of Fifth Amendment rights is not necessarily sufficient to effectuate a waiver of rights under the Sixth Amendment, Shaw was not coerced and was totally informed of a right to counsel. Shaw initiated the dialogue with police after full appraisal of his rights earlier and on that occasion as well. The totality of facts and circumstances in this case clearly support a knowing and intelligent waiver.

### III. Prosecutorial Misconduct

Shaw next alleges a pattern of prosecutorial misconduct which cumulatively deprived him of due process.

## A. Comments on Silence

1. Included in this allegation of misconduct are three comments said to trench upon Shaw's exercise of his Fifth Amendment right to silence following arrest. As we conclude later, two of the three comments of which Shaw complains are justified. We consider first the one which raises a serious question. This comment on Shaw's silence occurred during the direct testimony of Officer Pennington, one of the state police officers involved in Shaw's highway arrest. As the officer described the circumstances surrounding the seizure of Shaw's rifle, the following exchange took place:

Q. Did Officer Breland make any inspection of the rifle at that time?

A. Yes, sir, I believe Officer Breland did smell the barrel on the weapon before placing it in his vehicle; yes, sir.

Q. All right, what happened next then, Officer Pennington?

A. After the rifle was placed into Officer Breland's vehicle, I then read Ronald G. Shaw his *Miranda* rights, at which time he told me that he has heard those a thousand times. I advised him he would hear them a thousand and one.

After I read him the *Miranda* rights I asked him did he want to talk to us now and he put his head in a down position and shook it "no", and never did say a word.

Q. And you didn't attempt to question him further?

A. No, sir, I did not.

Shaw claims that Officer Pennington's testimony was an impermissible comment on his silence following arrest under *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 1624 n. 37, 16 L.Ed.2d 694 (1966). The government contends that the officer's statement was gratuitous, merely a recitation of events, and did not constitute an invitation to the jury to infer Shaw's guilt from the fact of his silence.

 Because it is "fundamentally unfair" simultaneously to afford a suspect a constitutional right to silence following arrest and yet allow the implications of that silence to be used against him, prosecutorial comment on silence for either substantive or impeachment value is constitutionally prohibited. *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). The alternative tests for determining whether a prosecutor's or witness's remarks[8] constitute comment on a defendant's silence are whether the "manifest intent" was to comment on the defendant's silence or, alternatively, whether the character of the remark was such that the jury would "naturally and necessarily" construe it as a comment on the defendant's silence: *United States v. Jones*, 648 F.2d 215, 218 (5th Cir.1981); *United States v. Fricke*, 684 F.2d 1126, 1133 (5th Cir.1982). Both the intent of the prosecutor and the character of the remarks are determined by reviewing the context in which they occur, *United States v. Forrest*, 620 F.2d 446, 455 (5th Cir.1980), and the burden of proving such intent is on the defendant. *United States v. Austin*, 585 F.2d 1271, 1280 (5th Cir.1978).

 In numerous cases this Court has held that mention of the fact of the defendant's silence following arrest by the prosecutor in his case in chief is a violation of constitutional dimension. *See Chapman v. United States*, 547 F.2d 1240, 1245 (5th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977) (question by prosecutor eliciting remark that the defendant said nothing following arrest constituted error); *United States v. Johnson*, 558 F.2d 1225, 1230 (5th Cir.1977) (testimony that the defendant expressed intent to remain silent even though coupled with words indicating her desire to cooperate was error); *Alderman v. Austin*, 695 F.2d 124 (5th

---

**8.** This Court has noted that the identity of the person making the improper comment regarding a defendant's silence is not dispositive of the due process issue, but rather that the examination should focus on the effect of the comment upon the jury. *United States v. Smith*, 635 F.2d 411, 413 n. 4 (5th Cir.1981); *United States v. Kaplan*, 576 F.2d 598, 600 (5th Cir. 1978) *cert. denied*, 439 U.S. 1078, 99 S.Ct. 858, 59 L.Ed.2d 47 (1979).

Cir.1983) (en banc) (single reference by law enforcement witness to fact that interview was terminated after the defendant stated he wished to remain silent constituted error); *United States v. Sklaroff,* 552 F.2d 1156, 1161 (5th Cir.1977), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978) (spontaneous remark by witness that defendant had not made a statement following *Miranda* warnings was error). The standard is strict; virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a *Doyle* violation. Accordingly, it appears inescapable that Pennington's remarks, even though unsolicited and couched in narrative terms, and to which no objection was made,[9] did constitute an improper comment upon silence as envisioned in *Doyle.*

■ Such a conclusion, however, does not end our inquiry. We are free to consider whether such a violation was harmless. The *Doyle* violation will not lead to reversal so long as it is harmless beyond a reasonable doubt. *Chapman v. United States, supra,* 547 F.2d at 1248. There has been considerable confusion in this Circuit regarding the standard to apply in evaluating whether a *Doyle* violation is reversible error.

In *Chapman,* the Court attempted to reconcile previous case law by establishing categories of *Doyle* violations as a means of weighing the effects of the error. *Chapman* separated our cases into the following three categories:

(1) "When the prosecution uses defendant's post arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous;"

(2) "When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, *i.e.,* when the prosecu-

tor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming;"

(3) "When there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error."

*Id.* at 1249 (citations and footnote omitted).

Essentially, these categories mandate that, in situations where there is but a single reference to the silence and the prosecutor does not link the act of remaining silent to the defendant's exculpatory story, the error will be harmless if the defendant's story is "transparently frivolous" and evidence of guilt is "otherwise overwhelming".

Subsequent cases have illustrated, however, that factual situations are not always amenable to description within the rigid *Chapman* types. *See United States v. Shavers,* 615 F.2d 266, 270 (5th Cir.1980); *Sullivan v. Alabama,* 666 F.2d 478, 485 (11th Cir.1982); *United States v. Meneses-Davila,* 580 F.2d 888, 895 (5th Cir.1978). Consequently, we have held *Chapman* inapplicable and the error to be harmless even though the defendant's story is "not totally implausible," but the evidence of guilt is "substantial." *United States v. Dixon,* 593 F.2d 626, 629 (5th Cir.), *cert. denied,* 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82 (1979); *accord United States v. Ylda,* 643 F.2d 348, 350 (5th Cir.1981). "[W]hile *Chapman's* categories are helpful, Fifth Circuit precedent demonstrates that the second and third categories are not to be used as rigid rules." *Alderman v. Austin, supra,* 695 F.2d at 126 n. 7.

---

**9.** Comments on a defendant's silence may constitute plain error, *United States v. Henderson,* 565 F.2d 900, 905 (5th Cir.1978). Thus, Shaw's failure to object on these grounds does not preclude review.

■ Accordingly, we must determine the effect of the error by the case-by-case analysis envisioned in *United States v. Davis,* 546 F.2d 583, 594 n. 31 (5th Cir.), *cert. denied,* 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). Such a determination requires "an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of the defendant's guilt." *United States v. Meneses-Davila, supra,* 580 F.2d at 890. *See also United States v. Dixon, supra,* 593 F.2d at 629.

An analysis of the cases in which we have found that reference to the defendant's silence created reversible error illustrates that this Court's basic concern has been whether or not the improper comment was harmless error because by its nature and under the circumstances it would have only an insignificant impact on the jury. Accordingly, we have reversed when we found that the remark "went to the heart of [the defendant's] sole defense," *United States v. Johnson, supra,* 558 F.2d at 1230; where the defendant's defense was "not so implausible as to be dismissed out of hand" and evidence of guilt was "not overwhelming", *United States v. Impson,* 531 F.2d 274, 278 (5th Cir.1976), *cert. denied,* 434 U.S. 1050, 98 S.Ct. 900, 54 L.Ed.2d 803 (1978); and where the prosecutor had argued the substantive or impeachment possibilities of the testimony, *United States v. Meneses-Davila, supra,* 580 F.2d at 895, or had directly tied the defendant's silence to the implausibility of his defense, *United States v. Luna,* 539 F.2d 417, 417 (5th Cir.1976).

We have found harmless error in cases where reference to the silence was neither made nor elicited by the prosecution, *United States v. Sklaroff, supra,* 552 F.2d at 1162; *United States v. Smith,* 635 F.2d 411, 413 (5th Cir.1981); *United States v. Whitaker,* 592 F.2d 826, 830 (5th Cir.), *cert. denied* 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979); where the prosecution did not "focus on" or "highlight" the reference, *United States v. Sklaroff, supra,* 552 F.2d at 1162, *United States v. Davis, supra,* 546 F.2d at 595, *United States v. Dixon, supra,* 593 F.2d at 630; where the comment did not "strike at the jugular" of the defendant's defense, *United States v. Smith, supra,* 635 F.2d at 414, *quoting United States v. Harp,* 536 F.2d 601, 603 (5th Cir. 1976); *United States v. Davis, supra,* 546 F.2d at 595; and where there was no further mention of the silence, and there was "strong evidence" of the defendant's guilt. *Sullivan v. Alabama, supra,* 666 F.2d at 485 (11th Cir.1982).

■ Pennington's statement was made during a narrative description of the events immediately following Shaw's arrest the night of the shooting. The remark passed without objection by the defense, was not directly elicited by the prosecutor, nor was it again referred to or mentioned in subsequent testimony or in closing.[10] The prosecutor did not highlight the reference to Shaw's silence in his examination of witnesses or in his closing remarks. Neither the prosecutor nor any prosecution witness tied together the fact of Shaw's silence with his improbable story. Moreover, as discussed in Section IV, in light of the many contradictory statements made by Shaw, as well as the testimony of other witnesses, there was strong evidence of Shaw's guilt.

If Officer Pennington's comment in any way undermined Shaw's exculpatory story that he had slipped and that the gun had accidentally discharged while he was headlighting deer, its effect was miniscule compared to the prejudicial effect Shaw caused himself by repeatedly changing his version of the events in order to conform to the mounting evidence against him. The potential for real prejudice from the comment was virtually nil. We cannot say there is a reasonable possibility that this isolated and unsolicited reference to Shaw's silence contributed in any way to his conviction. We hold that Pennington's comment was harmless beyond a reasonable doubt.

---

10. As explained in subsequent sections, the two other "references to silence" alleged by Shaw were proper rebuttal and direct testimony. Consequently, Officer Pennington's remark was the only reference during the trial which constituted error.

2. Shaw's next allegation of improper prosecutorial comment involved his reaction on December 27th to being shown the bullet which had been recovered from the hospital examining room. On cross-examination, the following exchange took place between Shaw and the prosecutor:

Q. He [the FBI agent] came in and showed you a bullet, didn't he, and showed you the gun and said, "Look at this. We got the bullet."

A. Yes, sir.

Q. You just hung your head, didn't you?

A. Yes, sir.

Q. That Monday you changed your story?

A. Yes, sir.

 In closing, the prosecutor referred to the same incident and said that Shaw "didn't have anything to say." While these statements standing alone appear to be attempts to draw attention to Shaw's refusal to speak, an examination within the context of the trial reveals them to have been entirely proper.

On direct examination, Shaw had testified that he had not held back his hunting accident story until Monday, December 29, but rather had tried to tell the FBI his exculpatory story on December 27th. He admitted, however, that he had refused to tell his story to FBI agents on Saturday. But he claimed he offered at that time to do so later on Saturday if the FBI would get in touch with his parents and have them present.[11] Consequently, Shaw had "opened the door" on direct examination to rebuttal of this claim by showing that the FBI had indeed tried to question Shaw on the 27th but that Shaw refused to talk.

The circumstances of this questioning closely parallel a situation addressed in *Doyle* itself. There, while simultaneously announcing the strict prohibition against the use of a defendant's silence for purposes of impeachment, the Supreme Court was nonetheless careful to note that

[i]t goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testified to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation, the fact of the earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.

*Doyle, supra,* 426 U.S. at 619 n. 11, 96 S.Ct. at 2245 n. 11 (citation omitted). Likewise, the fact of Shaw's silence on December 27th could properly be used by the prosecution to contradict his version of important evidence. The fact of the earlier silence was not used to impeach Shaw's exculpatory story, or to ask the jury to draw an inference of guilt, but rather it was used to rebut his claim that he was prepared to change his story prior to the time the authorities were possessed with conclusive evidence linking his gun to the shooting. *See also United States v. Dixon, supra,* 593 F.2d at 630, in which a government witness contradicted defendant's earlier testimony by stating on rebuttal that the defendant had not spoken to him even though he had been in defendant's presence several times. Because impeachment of the exculpatory story was "not the goal of the testimony" but the testimony was offered to rebut the inference of cooperation, "[n]othing in *Doyle* suggests" that this testimony should have been excluded. *Id.* Evidence of Shaw's silence when the FBI agent showed him his gun and the recovered slug was entirely proper rebuttal, brought into contention by Shaw's own testimony on direct.

3. Shaw's final allegation of error involves direct testimony by the county sheriff concerning Shaw's reaction after learning from the officer the reason he was being questioned. The sheriff testified as follows:

Q. Sheriff, let me ask you about what time it was when you were questioning him down in Ackerman?

11. Shaw's testimony that he had changed his story and admitted to firing the fatal shot before he had learned that the FBI had matched his gun to the bullet which killed the child would obviously bolster his credibility with respect to this subsequent story.

A. I left the sheriff's office in Webster County at 4:15. It was approximately 4:30 when I arrived at the office in Ackerman.

I questioned him about his whereabouts at ten after 1:00, told him that a little child had been shot in an automobile and it had just died, and that that was the question that I was questioning him about at that time. I questioned him for maybe ten or fifteen minutes.

Q. When you asked him that, what did he respond?

A. When I told him the reason for questioning him, he dropped his head and covered up his face and just sat there for a minute. And I described to him the condition of the child, and he didn't answer, he didn't say anything, he just sat there and looked at me.

I asked him about a rifle. He said he. had been deer hunting the evening before and he shot at three deer, or shot at a deer three times...

As illustrated by the last portion of the sheriff's response, Shaw freely responded to questions during this interview, both before and after being apprised of the child's condition. The lack of response to which the sheriff alluded merely expressed Shaw's demeanor during one point of the questioning. Even if death were accidental, a few moments of speechless silence upon hearing of the death would be a normal reaction. These remarks could not have been an impermissible comment on Shaw's exercise of his Fifth Amendment right to silence following arrest because Shaw was not, at this time, exercising such a right. There was neither silence nor a comment, but simply a description of an interview where Shaw did give a statement and did not remain silent.

B. Improper Use of Character Evidence

Shaw next claims that the government's repeated emphasis on his prior convictions and previous contacts with the law was improper, prejudicial use of character evi-

dence in violation of Fed.R.Evid. 609(a)(1) and 404.

1. Initially, Shaw challenges admission into evidence of his 1974 convictions for rape and assault with intent to rape. Evidence of a prior conviction is permissible under Rule 609(a)(1) so long as a conviction is for a crime punishable for more than one year, the probative value of the evidence exceeds its prejudicial effect, and so long as the evidence is used only to impeach. Shaw claims that the trial judge failed to weigh the prejudicial effect of admitting his prior convictions against its probative value. Such an on-the-record determination was mandated by this Court in *United States v. Preston,* 608 F.2d 626, 639 (5th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980). Further the trial court's holding will be reviewed under the abuse of discretion standard. *Id.* *See also United States v. Martinez,* 555 F.2d 1273, 1276 (5th Cir.1977).

Before trial, the parties had stipulated that Shaw had been convicted of a crime punishable by more than a year. Before Shaw took the stand, the trial court ruled that it was proper to allow proof of the nature, or at least the name, of the offense where the fact of the felony conviction was already before the jury. The court reasoned that such proof would result in less prejudice to Shaw than would allowing the jury to speculate as to whether the prior offenses were similar shootings or murders. These considerations evince the trial judge's observance of concerns voiced in *Preston.* His comments manifest a determination that the prejudicial effect upon Shaw would be minimized if the nature of his convictions were revealed to the jury. A remand for such a determination would be both superfluous and a waste of judicial resources.

2. Shaw next complains that certain cross-examination questioning was improper use of character evidence, in violation of Rule 404 of the Federal Rules of Evidence. That rule embodies the well-settled principle that evidence of a person's

character is generally not admissible for the purpose of showing that a person acted in conformity with his or her character on a particular occasion. *United States v. Beechum,* 582 F.2d 898, 910 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979) [12]

On cross-examination, the prosecutor asked Shaw whether he had been drinking on Christmas night and whether he became violent when drinking. Shaw's attorney objected, but his objection was overruled on the ground that whether Shaw was intoxicated was directly relevant to his state of mind and intent under F.R.E. 404(b). Shaw responded by denying that drinking caused him to be violent, but now claims that the government was trying to Show, not that he had been drinking and violent on the night in question—arguably relevant to his ability to commit premeditated murder—but what character traits he exhibited while drinking. The purpose, Shaw contends, was to show the jury that if he became intoxicated and violent in the past, he would become intoxicated and violent in the future—*i.e.,* that on the night of December 25, Shaw acted in accordance with his character.

■■■■ Rule 404 is a rule of inclusion, *United States v. Halper,* 590 F.2d 422, 432 (2d Cir.1978), which admits evidence of other acts relevant to a trial issue except where such evidence tends to prove only criminal disposition. *United States v. Brown,* 562 F.2d 1144, 1147 (9th Cir.1977); *United States v. Boyd,* 595 F.2d 120, 126 (3d Cir.1978). The rule is exclusionary only as to evidence admitted to establish bad char-

acter as such; it very broadly recognizes admissibility of prior crimes for other purposes. *See* Fed.R.Evid. Rule 404(b); *United States v. Beechum, supra,* 582 F.2d at 910. The trial court must determine that the evidence is relevant to some issue at trial other than to prove the character of the defendant for the purpose of showing that he acted in conformity therewith, and that its probative value is not substantially outweighed by the danger of unfair prejudice. *United States v. Benton,* 637 F.2d 1052, 1056 (5th Cir.1981); *United States v. Aleman,* 592 F.2d 881, 885 (5th Cir.1979). When the admission of such evidence is challenged on appeal, the duty of the appellate court is to assess its relevancy and probative value, and the district court's ruling will be reversed "[r]arely and only after a clear showing of prejudicial abuse of discretion." *United States v. Davis,* 546 F.2d 583, 592 (5th Cir.), *cert. denied,* 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977).

■■■■ Here, there is no showing that the government was attempting to convince the jury that Shaw was a bad man. Shaw's propensity for aggression when drinking was probative of whether he possessed the requisite intent deliberately to shoot a rifle into a passing car. Whether Shaw became disproportionately aggressive while drinking had relevance to establishing an element of the crime charged—premeditation—as being more probable than it would have been without such evidence. In addition, the likelihood of unfair prejudice accruing to Shaw as a result of the question-

---

**12.** Rule 404 provides as follows:

Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes
(a) Character evidence generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
 (1) Character of accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;
 (2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence

of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;
 (3) Character of witness. Evidence of the character of the witness, as provided in rules 607, 608, and 609.
(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

ing was virtually nonexistent. As stated earlier, Shaw denied that he acted violently when intoxicated, and stated that his drinking that night had no effect on his behavior. The government made no attempt to rebut this denial by extrinsic evidence. Balancing the question's probative value against its possible prejudicial effect, we find that the trial judge's ruling was not a clear abuse of his discretion. *United States v. Vincent,* 648 F.2d 1046, 1051 (5th Cir.1981).

▮ 3. Shaw finally claims that the government's repeated references to his criminal record went beyond legitimate efforts to attack his credibility, but rather were attempts to convict him because of bad character. He cites comments by the prosecutor in closing argument that Shaw "cared nothing for the law", that one of the arresting officers "knew Shaw, ... knew what sort of man he was," that the prosecutor didn't see "any reason to give any credibility to anything that a convicted rapist, a double-convicted rapist and admitted liar will tell you." A careful review of closing argument, however, convinces us that the prosecutor's statements in full context were proper attempts to impeach Shaw's credibility or to prove his willingness to violate the law which prohibited him from carrying a firearm. We do not consider them attempts to link Shaw's prior conviction with the likelihood that he would have committed a crime on the present occasion.

### C. Cross-examination.

Shaw next alleges that the prosecutor engaged in a pattern of improper cross-examination of defense witnesses. First, he contends that the prosecutor misstated the content of statements made by Shaw to the FBI and statements made earlier to the grand jury by the witnesses themselves, and then asked defense witness questions with respect to those statements. Shaw claims this tactic caused the jury to draw negative inferences about the reliability of his witnesses. Second, he complains that, because the trial court did not allow him to introduce evidence of those statements at trial,[13] he was effectively denied his Sixth Amendment right of confrontation.

Shaw's defense consisted primarily of his own testimony. The cross-examination of which he complains involves intermittent questioning by the prosecutor of several acquaintances of Shaw's who had been with him the night of the shooting. For example, the prosecutor asked a witness who had been a passenger in Shaw's truck earlier that night, whether if Shaw told the FBI he picked her up at 7:30 "that would be correct." The witness replied, "No. It was around 9:30." The prosecutor also asked a cousin of Shaw's, whether if Shaw told the FBI he "had some drinks at this club y'all went to, would that be correct." The cousin replied that "[h]e didn't have any, he bought Coke when I saw him." The prosecutor continued by asking, "So if he [Shaw] said he had some drinks up there he'd be mistaken?", and the cousin answered, "I don't know. I didn't see him drink anything but Coke." The prosecution also questioned the cousin as to whether she "told the grand jury [she and Shaw] were looking for friends in Eupora, then Mr. Shaw just started driving to Starkville? Isn't that what you said?" The cousin replied, "No. We decided to go to Starkville to see if we could find some friends."

Shaw contends that this questioning was analogous to that in *Harris v. Spears,* 606 F.2d 639 (5th Cir.1979), in which this Court found that statements by the prosecutor of facts not in evidence violated the defendant's Sixth Amendment rights and constituted reversible error. We find his reliance misplaced. In *Harris,* a prosecution for murder, the prosecutor's questions during the cross-examination of the defendant suggested that the defendant's son had witnessed the killing and had given a story to

---

**13.** Prior to Shaw's calling the FBI agent as a witness for the defense, the trial court sustained a motion by the government that any question as to the content of the agent's interview with Shaw would be impermissible hearsay. But as is pointed out later in this opinion, Shaw had engaged in a full cross examination of the agent when he was earlier called as a prosecution witness.

police which was contrary to the defendant's testimony. The son was never called to testify, and consequently, the prosecutor's "highly suggestive" and prejudicial questions were not subjected to the test of cross-examination required by the Sixth Amendment.

Here, Shaw cannot complain that he had no opportunity to present the "facts" of the FBI interview or of the cousin's earlier statements to the Grand Jury. The defense was in possession of copies of both the FBI and Grand Jury statements, and Shaw had earlier engaged in a full cross-examination of the FBI agent when he was called as a prosecution witness. Nor was the potential for the "ineradicable" prejudice found in *Harris* present here. The only "disadvantage" which accrued to Shaw as a result of the court's refusal to allow him to question the agent on direct as to the content of the interview was that the defense was thereby required to call Shaw to the stand, if it wished to offer his exculpatory story. The trial court properly insisted that Shaw could not be permitted to "come in the back door" and introduce his statement through the FBI agent. Moreover, any "negative inferences" which the jury may have derived from this isolated questioning of Shaw's cousin and friends were necessarily minor. These defense witnesses were at best of tangential benefit to Shaw's case. Their testimony related only to Shaw's whereabouts up to an hour before the shooting and in no way bolstered his version of the shooting as having accidentally occurred while he was "headlighting" deer.

 We conclude from our review of the record that the district court did not deny Shaw the opportunity "to expose to the jury the facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability" of his witnesses. *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). The only statements referred to were those of the witnesses themselves, or of Shaw, copies of which were in the possession of defense counsel. Every question related to someone who had earlier testified in this case. In addition, there was little, if any, prejudice caused Shaw by the questioning. The court's ruling in no way amounted to a derogation of Shaw's confrontation rights.

### D. Misrepresentations

Shaw also argues that repeated misrepresentations by the prosecutor tainted his cross-examination when he took the stand. He stresses testimony concerning the indentation in the leaves of Ballard Creek,[14] the evidence of the trajectory of the fatal bullet offered at Shaw's preliminary hearing, and the number of loose shells in the cab of the truck. These misrepresentations, Shaw contends, constituted a "knowing use by the prosecution of false evidence" and require a reversal.

We have examined the record of both the trial and of the preliminary hearing, and find Shaw's claims to be wholly without merit. For example, Shaw alleges that the prosecutor "grossly misstated" what Sheriff Mills had said at the preliminary hearing about the indentation in the leaves. At trial, the prosecutor asked Shaw whether the sheriff had said that "the leaves were so well wallowed down, it looked like somebody had been there for a considerable time, not like they had fallen down, but they had been there for a considerable time, working those leaves down?" Shaw replied that he did not remember. Mills' actual testimony at the preliminary hearing was that "there was no problem to see" that "someone had been down on their knees and probably in a prone position, kneeling behind these two trees...." In response to a question at the preliminary hearing on cross-examination, Mills replied that he would characterize the markings as showing that "someone had been lying there ... [e]ither down on their knees or they went down in the prone position." Later on

---

14. During their initial investigation of the Ballard Creek rest stop, police discovered a "hollowed out" area of leaves. The prosecution focused on this evidence to prove its charge of premeditated murder.

cross, he added "that's what it appeared to me, that someone had been down on their knees or either lying right there behind those trees."

While one could argue a distinction between this testimony and the prosecutor's characterization of the testimony as revealing that someone had been lying down "for a considerable time", the difference certainly does not rise to the level of "a knowing use by the prosecution of false evidence". Similarly, at trial the prosecutor asked Shaw whether he had heard FBI Agent Marsh testify at the preliminary hearing that the shooting "couldn't have happened the way you said." At the preliminary hearing Marsh had testified that the trajectory results were "inconsistent with the story as related to me by Mr. Shaw at Old Trace," and added that the trajectory evidence was consistent with the theory that there was someone "in a kneeling position" at Ballard Creek. Certainly, the prosecutor's questions at trial were not a "gross misstatement" of the agent's preliminary hearing testimony, nor did they create any false material inferences.

Shaw next complains that the prosecutor intentionally misrepresented both trajectory evidence and the number of bullets present in the cab of Shaw's truck. In closing, the government suggested to the jury that the shooting could have occurred by Shaw's firing from the rear toward the front of the Brinkley car. This hypothesis was not in conflict with evidence offered at trial, because evidence of the bullet's trajectory had not been offered by either side. Shaw argues, however, that the hypothesis was inconsistent with the true facts known by the prosecutor. Shaw claims that this misstatement bolstered the testimony of two witnesses, Lee and Ann Avery, who had testified that they had seen a man pointing a gun out of a pickup, aiming the gun down the highway, on the Natchez Trace Highway earlier the evening of the shooting. No objection to this statement was made at trial.

The portion of the closing argument in question was confusing, and there is little likelihood that the jury would have mentally associated these remarks with the Averys' testimony. Moreover, whether or not the fatal shot which killed the child entered from the rear of the car was in no way probative of whether the person the other witnesses had seen earlier was in fact Shaw. Because the trajectory evidence was not offered at trial, and because the jury knew that the bullet had entered the car through the right door, not the rear, any mistaken impression upon the jury was minor. There was no objection to the argument; there was no evidence introduced at trial which controverted the prosecutor's conclusions; and any mistaken impression upon the jury was minor, if not nonexistent. Certainly this was not a conviction obtained by the use of false evidence.

Shaw also objects to the prosecutor's claim that Shaw had been surprised by the testimony of the Averys that they had seen a man in a truck pointing a gun down the Natchez Trace Highway. Shaw does not contend that the Averys' testimony was incorrect. The contention is that such comment by the prosecutor was impermissible because the record is silent as to whether Shaw knew of these witnesses. It is well-settled that the prosecution has the right to urge a conclusion based on the evidence. *See United States v. Grapp*, 653 F.2d 189, 195 (5th Cir.1981); *United States v. Morris*, 568 F.2d 396, 401 (5th Cir.1978). This remark was well within that prerogative.

Shaw finally complains that the prosecutor intimated in closing that defense counsel was trying to suggest to the jury that there were more than five live shells found in Shaw's truck, when defense counsel knew that there were, in fact, only five.[15] Shaw claims this was improper and unfair because the prosecutor knew that it was true that other rounds had been found in a box in the cab and in Shaw's jacket.

---

**15.** As discussed in Section IV, *infra,* the number of bullets found in the truck was an impor-

tant factor with respect to Shaw's story that he had been "headlighting deer."

The only testimony offered by any witness other than Shaw at the trial was that four live bullets were found on the floor of the pickup. It was not improper for the prosecutor to stress this point.

### E. Closing Argument

Shaw's final assertion of prosecutorial error concerns numerous allegations of misconduct during the closing argument by the government attorneys. Having carefully examined the record and having considered together the various instances of the challenged argument, we find that the only objection of substantial merit is Shaw's contention that the prosecutor improperly went beyond the record and expressed his personal belief as to Shaw's guilt. Accordingly, we shall limit our analysis to this issue.

In his closing, the prosecutor commented that in seven years of trying cases he had never seen a "colder, more cold blooded, remorseless defendant."[16] At this point, the appellant objected. The objection was overruled, but the trial judge promptly instructed the jury that the arguments of counsel were not to be considered as evidence. Shaw contends that these remarks prejudiced his right to a fair trial.

 The role of the attorney in closing argument is limited to assisting the jury in "analyzing, evaluating, and applying the evidence." *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir.1981). An advocate may express his contention as to the conclusions that the jury should draw from the evidence, but statements expressing personal belief in the merits of a case are to be deplored as constituting conduct beyond the scope of the legitimate argument. *United States v. Garza*, 608 F.2d 659, 663 (5th Cir. 1979); *United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir.1981) *cert. denied sub nom., Meinster v. United States*, —— U.S. ——, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). When made by a representative of the government, these statements acquire additional significance because of the position of public trust occupied by the speaker. *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). As stated in *Berger*, the government attorney "may prosecute with earnestness and vigor; indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." *Id.* at 88, 55 S.Ct. at 633. This does not mean to say, however, that every instance of objectionable comment or opinion will constitute reversible error. Each case involving a prosecutor's improper personalized argument as to guilt must be examined in terms of its effect on the jury's ultimate verdict. It is only where the impropriety resulted in prejudice to the "substantial" rights of the defendant that a new trial is constitutionally required. *Id.* at 82, 55 S.Ct. at 630. *United States v. Dorr, supra*, 636 F.2d at 120; *United States v. Garza, supra*, 608 F.2d at 663; *United States v. Mireles*, 673 F.2d 756, 758 (5th Cir.1982).

Shaw claims that the prosecutor's remark was an elemental factor in the jury's finding him guilty of premeditated murder. The government contends that the remark

---

16. The exact remarks were as follows:

THE PROSECUTOR: "I'll tell you something else he didn't care about, either. That was the thing that shocked me the most. Al and I have tried a lot of cases. I've been prosecuting seven years, kidnapping, rapes, every type offense you can have. And all that time, I've never seen a colder, more cold-blooded, remorseless defendant. You saw him testify—
DEFENSE COUNSEL: I object to the opinion of counsel.
THE COURT: Overruled. Ladies and Gentlemen, I will tell you in my closing instructions in the case that counsel's argument is not to be taken and considered as evidence

by you in the case. It is simply his way of explaining the case to you. All right, you may proceed.
THE PROSECUTOR: Let me put it this way: you ladies and gentlemen recall your own experience. You saw Ronald Shaw testify. You saw his demeanor and manner on the stand. Did he ever say he was sorry, did he ever show any remorse for this little boy he killed. He sat up there for an hour and a half and said, "Yes, I killed him." "Yes, it was my gun that fired the shot." And, he went on. Not one drop of remorse. That shows you what sort of man he is. I ask you, are you going to believe a man like that?

was only an attempt to call the jury's attention to the defendant's demeanor on the witness stand, and in any event was a single, isolated remark, any prejudicial value of which was cured by the judge's immediate instructions to the jury.[17] An analysis of recent decisions of this Court is instructive.

In *Baiocchi v. United States,* 333 F.2d 32 (5th Cir.1964), this Court was asked to evaluate closing remarks of a prosecutor strikingly similar to those at issue here, but even more a personal expression of defendant's guilt. In rebuttal, the government attorney remarked:

> ... I have been trying cases for a year now, and, in the time that I've been trying cases, the cases that I've worked with I've never in my own mind been more certain, absolutely certain, after working as hard on a case, never been more certain or as certain of guilt as in this case."

*Id.* at 37. The defendant's attorney objected and moved for a mistrial. The trial court denied the motion, but immediately cautioned the jury to disregard the statements. On appeal, we found that these remarks were "improper and immaterial," *id.,* but that, viewed with respect to the case as a whole, they did not so prejudice the defendant as to mandate that a mistrial should have been granted.

In *United States v. Enstam,* 622 F.2d 857 (5th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981), a prosecution for income tax evasion, the prosecutor stated in closing that:

> [A] jury trial is a search for the truth. What happened. The documents in testimony, the totality of that tells the truth. That is what I care about. That is what our system is all about. You are to determine the truth. Here is what the truth is in just one minute or less. Paul Larue Hodgson was a cocaine dealer and he needed a way to launder money. The defendant Holley was a cocaine dealer and he needed a method to launder money.

*Id.* at 869. The defendant urged that these comments were an improper assertion of the prosecutor's personal belief. While admitting that the prosecutor's remarks might have been "slightly overzealous", *id.,* the Court found that his statement concerning the truth was "only his way of summing up the evidence." *Id.* To the extent the comments transcended the proper bounds of argument, any error was cured by the judge's immediate instruction that "the jury will make no finding unless it is based on the evidence and in accordance with my instructions." *Id.* at 870. *See also United States v. Rodarte,* 596 F.2d 141, 146 (5th Cir.1979), where the prosecutor's comment in closing that "Ladies and Gentlemen, I think you can see that these are not the words or the acts of an innocent man" was deemed not reversible error, but argument of permissible conclusions to be drawn from the evidence; *United States v. Durnin,* 632 F.2d 1297, 1299 n. 3 (5th Cir.1980) where prosecutor's statement in closing argument that he believed the defendant had lied was held not to be reversible error because the prosecutor did not convey the impression that he possessed private, extrinsic information supporting his belief, and because the court gave an immediate curative instruction.

Such observations are equally compelling here. This is not a case, such as *Dunn v. United States,* 307 F.2d 883, 885 (5th Cir. 1962), in which prosecutorial misconduct was pronounced and persistent. Nor are we faced with the situation such as that in *United States v. Garza, supra,* 608 F.2d at 665, where the contested remarks were highly inflammatory and where there was no curative instruction from the bench. The remarks by the prosecutor concerning Shaw's cold-bloodedness, taken in context, could be read as expressions of personal belief as to a trait which were based squarely on the record evidence before the jury. The prosecutor believed Shaw "cold-blooded" as a result of his observance of Shaw's demeanor on the witness stand. Any possible prejudice was cured by the immediate admonition given the jury by the

---

**17.** At oral argument, the government conceded that the remark was improper.

trial court. Moreover, a thorough reading of the record convinces us that the evidence of premeditation in the case was not so close as to cause us to believe that the prosecutors' mention of the cold-bloodedness of the defendant swayed the jury's decision. Here, unlike the situation in *United States v. Dorr, supra,* 636 F.2d at 120, the prosecutor's comments did not bolster the ultimate and only testimony against a defendant. Rather, the jury had considerable additional evidence on which it could predicate a determination of guilt.[18] *See also United States v. Phillips, supra,* 664 F.2d at 1031 (5th Cir.1981) (in determining the overall degree of prejudice in closing argument, an appellate court may consider the strength of the evidence against each defendant).

■ In conclusion, although we agree with Shaw that the prosecutor's comment was improper, it was not a blatant expression of personal belief in guilt. Further, we conclude that the remark did not prejudicially affect his substantial rights. This conclusion is based upon the overall strength of the evidence against Shaw, plus the failure of the prosecutor to convey the impression that he possessed private or extrinsic information supporting his belief. Further, the court gave an immediate curative instruction. Finally, the record shows that prosecutorial misconduct was neither repeated nor extreme. We conclude that the prosecutor's comment did not constitute reversible error.

## IV. Sufficiency of the Evidence

Shaw next challenges the sufficiency of the evidence to support the jury's verdict of guilty of first degree murder under 18 U.S.C. § 1111.[19] He does not assert that the government failed to prove that he killed Terrell Johnson. The evidence clearly established that he fired the fatal shot. He does argue, however, that the government's evidence is insufficient to support the first degree murder conviction because it failed to establish that he committed the homicide with premeditation.

■ In determining the sufficiency of the evidence, a court of appeals must view the evidence and all reasonable inferences which may be drawn therefrom, in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We will affirm if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ Section 1111 retains a common law distinction between second degree murder, which requires a killing with malice aforethought, and first degree murder, which in addition to malice aforethought requires a killing with premeditation and deliberation.[20] Although it is clear that deliberation and premeditation under § 1111 involve a prior design to commit murder, no particular period of time is necessary for such deliberation and premeditation. *See United States v. Blue Thunder,* 604 F.2d 550, 553 (8th Cir.) *cert. denied,* 444 U.S. 902,

**18.** *See* discussion in Section IV, *infra.*

**19.** Title 18, § 1111, of the United States Code provides in pertinent part:
 (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing ... is murder in the first degree. Any other murder is murder in the second degree.

**20.** We note that both first and second degree murder require proof of a killing with "malice aforethought." Malice does not require a subjective intent to kill, but may be established by evidence of conduct which is a "reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm." *United States v. Black Elk,* 579 F.2d 49, 51 (8th Cir.1978). Consequently, to support a conviction for either first or second degree murder, the government need only prove that Shaw intended to shoot at the passing car with a "heart ... without regard for the life and safety of others", *United States v. Hinkle,* 487 F.2d 1205, 1207 (D.C.Cir.1973), and that a death resulted. A conviction for first degree murder requires the additional proof of premeditation, poisoning, or lying in wait.

100 S.Ct. 215, 62 L.Ed.2d 139 (1979); *United States v. Brown,* 518 F.2d 821, 826 (7th Cir.), *cert. denied,* 423 U.S. 917, 96 S.Ct. 225, 46 L.Ed.2d 146 (1975). There must be some appreciable time for reflection and consideration before execution of the act, although the period of time "does not require the lapse of days or hours or even minutes." *Bostic v. United States,* 94 F.2d 636, 638 (D.C.Cir.1937), *cert. denied,* 303 U.S. 635, 58 S.Ct. 523, 82 L.Ed. 1095 (1938).

 The distinction which marks the line between "deliberation" sufficient to support a conviction of first degree murder and the lesser killing with malice which supports conviction of second degree murder is less than clear. Commentators agree that the difference between the two standards is vague and obscure, *see* W. LaFave & A. Scott, *Criminal Law* § 73 (1972); Cardozo, *Law and Literature and Other Essays,* 99–100 (1931). Perhaps the best that can be said of deliberation is that it requires a "cool mind" that is capable of reflection, and of premeditation that it requires that the one with the "cool mind" did, in fact, reflect, at least for a short period of time before his act of killing. LaFave, *supra* at 563. We are aided in our analysis of this element by the specific wording of the federal statute. If the evidence supports a finding that Shaw was "lying in wait",[21] he shall be guilty of murder in the first degree. With these standards in mind, we turn to our consideration of the evidence offered at Shaw's trial.

Brinkley, the driver of the car in which the children were riding, and Mrs. Johnson, the children's mother, both testified that they were certain that the shooting had occurred almost immediately after their car had passed the Ballard Creek rest stop. Both explained that their certainty was due to the fact that Brinkley, a long distance truck driver, had previously had an accident on the Natchez Trace Highway and that he was looking for his "special tree" a mile and a half north of the Ballard Creek rest stop

in order to show Mrs. Johnson where the accident had taken place. Three police officers and one FBI agent testified that there was a "mashed down area" behind two large oak trees on the east side of the highway at the Ballard Creek rest stop. The indentation was described as three or four inches deep and approximately six feet long, including an area where it appeared the leaves had been kicked aside to accommodate a person's elbows. According to the local sheriff, the appearance of the leaves left the "impression there that appeared that someone had been lying behind these trees, concealing himself from the Natchez Trace."

Two witnesses, Ann and Lee Avery, driving together on the Natchez Trace Highway approximately an hour before the shooting occurred, testified that they had come across a "pretty late model" two-tone Ford pickup of a "light and dark" color, pulled off the side of the road. The truck's lights were off, and a man was leaning out of the driver's window, pointing a rifle down the highway in the direction the two were heading. Lee Avery testified that the truck looked silver or gray and blue or maroon. He also identified the rifle as a "lever-action" type with a curved lever as was the rifle belonging to Shaw. Avery was sure of this identification of the gun because he owned an identical rifle of a different caliber. On cross-examination Shaw admitted being in the same area with his truck at the time described by the Averys. A park officer testified that on the evenings of December 22 and 23, he had seen a pickup "just like" Shaw's with its lights off parked near Ballard Creek. The truck was the same color and model as Shaw's, but had no license plates on the rear and did not have a dog pen in the back as did Shaw's the night he was arrested.

Although Shaw had originally denied that he had fired his gun on the night of the 25th, his story at trial was basically that he had been drinking and "riding around"

---

21. "Lying in wait" is generally held to require a watching and waiting in a concealed position with an intent to kill or do serious bodily harm to another. It does not require being in a prone position. *See* annotation and cases cited therein, 89 A.L.R.2d 1140 (1963).

on Christmas night and decided to go to the Natchez Trace in order to "headlight some deer". He pulled over near the Old Trace rest stop,[22] saw a deer crossing the highway in front of him, and shot at it. Believing he had hit the deer, he turned off the truck lights and left the truck to go after the animal. At that time, he heard a car approaching from the south. Aware that his possession of a rifle was illegal, he attempted to conceal himself behind a pine tree on the side of the road. Simultaneously, he slipped and fell, and as he hit the ground, the rifle discharged and the Brinkley car passed in front of him.

None of the evidence corroborated Shaw's story. Brinkley and Mrs. Johnson testified that the truck's grill was facing them as they approached, not parked heading up the highway as Shaw claimed. Both were certain the shooting had taken place at the Ballard Creek, not the Old Trace rest stop, as claimed by Shaw. Although Shaw explained that he was on the deserted highway after midnight with a loaded high powered rifle because he was pursuing a shot deer, the evidence strongly suggested that no shot had been fired prior to the one that killed the Johnson child. Despite an exhaustive search, no spent shell was ever located, at either Ballard Creek or the Old Trace. In addition, police discovered five live rounds in the cab of the truck,[23] four on the floor, and one jammed in the gun's magazine. If one adds the shell that killed the child, the total number of bullets retrieved was seven—the maximum capacity of the rifle. If Shaw's story about having shot the deer were truthful, there would have been eight shells—one over the maximum capacity of the rifle.

It is uncontroverted that Shaw was on the Natchez Trace Highway after midnight with a fully loaded rifle, and that he fired the shot which killed the child. There is scant explanation for the shooting, save his unsupported story that he was attempting to pursue a wounded deer. Testimony by the Averys and the park ranger support an inference that Shaw had been parked on the highway, once with his lights off and his rifle aimed down the road, on an earlier occasion. Shaw evaded apprehension when first confronted by the police. The fact of the hollowed-out area of leaves at Ballard Creek contradicts his version of the facts and bolsters that he was lying in wait to take aim at a passing car. And most important, Shaw repeatedly changed his story, and admitted that his statements to the police and FBI on December 26 and December 27 were a lie.

The government's case was largely circumstantial. But, whether the evidence is direct or circumstantial, the scope of the review of the evidence is the same. *See United States v. Bell,* 678 F.2d 547, 549 n. 3 (5th Cir.) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982). Accepting all reasonable inferences and credibility choices gathered from the evidence in the light most favorable to the government, we must decide if the jury's verdict was supportable. It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be totally inconsistent with every conclusion except that of guilt. *Id.* at 549. We will reverse only if a reasonably minded jury must necessarily have entertained a reasonable doubt of the defendant's guilt. *United States v. Alonzo,* 681 F.2d 997, 1000 (5th Cir.1982); *United States v. Herman,* 576 F.2d 1139, 1144 (5th Cir.1978). We are convinced that the evidence presented in this case permitted a reasonable jury to conclude that Shaw's story was false, that he was lying in wait behind the trees at Ballard Creek, and that he formed a conscious choice to shoot at the Brinkley's passing car. The totality of the evidence supports the jury's finding of premeditation and guilt as charged.

**22.** Brinkley and Mrs. Johnson had testified they were certain the shooting had occurred immediately after they had passed the Ballard Creek rest stop, several miles north of the Old Trace stop.

**23.** Shaw admitted emptying the rifle of ammunition after the police gave chase.

## V. Jury Instructions

Shaw next contends that the district court's supplemental jury instructions were erroneous. Less than an hour after beginning deliberations, the jury sent the judge a note asking him to explain "the technical difference between first degree murder and second degree murder." The court explained that the difference between the two charges was premeditation, and reiterated its initial instruction on that element.[24] Shaw claims that the court erred when it reinstructed the jury on the definition of "premeditation" without also redefining "malice aforethought." He claims this instruction confused the jury and unfairly gave undue emphasis to the one element of premeditation.

We reject this contention. First, Shaw makes no assertion that the definition of premeditation given by the judge was not entirely correct. The definition was a verbatim repetition of the charge originally made to the jury, a charge which the defendant himself had requested to the court. In no way could the instruction have impermissibly altered the offense alleged in the indictment. *See United States v. Ylda,* 653 F.2d 912, 913 (5th Cir.1981); *Stirone v. United States,* 361 U.S. 212, 219, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960). Second, this is not the kind of situation which mandated our reversal in *Bland v. United States,* 299 F.2d 105 (5th Cir.1962). In *Bland* the applicable statute read to the jury by the judge did not expressly state that the offense charged needed to be committed willfully or knowingly. Consequently, the jury was not reinstructed on the defendant's sole defense. Here, the district court did reinstruct the jury that in order to convict Shaw of first degree murder, they had to find premeditation. Moreover, malice aforethought was a condition precedent to conviction for both first and second degree murder, and therefore was not critical to the jury's request for an explanation of the *difference* between the two offenses.

We note also that the court did call the jury's attention to the fact that malice aforethought, in addition to premeditation, was required to convict. The original and supplemental charges sufficiently instructed the jury on the applicable law. *See United States v. Caucci,* 635 F.2d 441, 446 (5th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981). Finally, rather than having confused the jury, the trial court's definition of premeditation was a cogent attempt to clarify the jury's misunderstanding. An explanation of the difference of premeditation either without any accompanying explanation of the legal definition of that term, or by reading again the entire original charge, would have been confusing and unresponsive.

■ Evaluating the trial court's action in light of the totality of the circumstances and considering the specific question asked by the jury, we find no error in the court's instructions.

---

24. The exact wording of the court's supplemental charge was as follows:

> THE COURT: Mr. Meyer, you are foreman of the jury, and I have your inquiry here addressed to me, "We are in a disagreement as to the technical difference between first degree murder and second degree murder." In that connection, you are advised that the difference between first degree murder and second degree murder is that first degree murder requires premeditation and second degree murder does not. Now, I want to reread to you that portion of my original charge with reference to premeditation, so that you may understand the premeditation, difference between the two, first and second degree murders.
>
> Premeditation, which is required in addition to malice aforethought in order to establish the offense of first degree murder, is typically associated with murder in cold blood and requires a period of time in which the accused cooly deliberates, or thinks a matter over, before acting. The necessary duration of that period cannot be arbitrarily fixed.
>
> The time required to form a deliberate plan or design varies as do the minds and temperaments of human beings differ, and according to the surrounding circumstances in which they may be placed. Any interval of time between the forming of a specific intent to kill and the execution of that intent, which is of sufficient duration for the accused to be fully conscious and mindful of what he intended willfully to set about to do, is sufficient to justify a finding of premeditation.

## VI. Multiplicitous Counts

Shaw's final argument is that Count Five of his indictment, which charged him with carrying a firearm in the commission of Count Four, the assault with intent to kill Lachelle Johnson, was multiplicitous and should be dismissed. Count Five charges a violation of 18 U.S.C. § 924(c) and Count Four, a violation of 18 U.S.C. 113(a). Shaw contends that a 924(c) offense—a so-called carrying and using statute—does not apply to assault, citing *Busic v. United States,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980). In *Busic,* the Supreme Court held that Congress did not intend § 924(c) to apply to cases in which the underlying felony statute provided for increased penalties where a firearm is used in the commission of the offense. *Id.* at 405, 100 S.Ct. at 1752.

The issue then is whether § 113(a)[25]—assault with intent to commit murder—provides for an enhanced punishment when a firearm is used. We find that it does not. Unlike sections 111 and 112, which specifically mention an additional penalty for use of a firearm, § 113 creates five separate offenses with no mention of extra penalties for using a gun in commission of the crime. Shaw's only support for his contention that the carrying and using statute does not apply to § 113 comes from part of the section's legislative history in which one of the statute's sponsors had stated that 924(c) was not intended to apply to "title 18 Sections 111, 112, or 113, which already defined the penalties for use of a firearm in assaulting officials." 114 Cong. Rec. 22232, quoted in *Busic, supra,* 446 U.S. at 405, 100 S.Ct. at 1752. But section 113 differs broadly from sections 111 and 112. It does not mention penalties for use of a firearm and does not even refer to assaulting officials. The casual remark of the Congressman cannot be taken as definitive of the scope and content of section 113. Because section 113(a) does not include a separate enhancement provision, the district court's consecutive sentence under Count Five was proper.

Shaw also claims that Count Four, charging him with assault with intent to murder, is multiplicitous to Count Two which charged him with first degree murder, because one discharge of a firearm should result in one punishment, even if two people are hit by the bullet.[26] The authority relied upon by Shaw, *Ladner v. United States,* 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958) does not lead to the result he urges. *Ladner* held that a single discharge of a shotgun which injured two persons constituted only a single violation of 18 U.S.C. § 111. The statute, however, penalized only assaults on federal officers, and there is an established, specific congressional intent making one episode of interference with federal officers a single offense, regardless of the number of injuries.

There is no similar congressional directive here. A single act may cause more than a single consequence; therefore, a defendant may be convicted of two separate offenses arising from a single act so long as each requires proof of a fact not essential to the other. *United States v. Chrane,* 529 F.2d 1236, 1238 (5th Cir.1976).

25. Section 113 provides as follows:

Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:

(a) Assault with intent to commit murder or rape, by imprisonment for not more than twenty years.

(b) Assault with intent to commit any felony, except murder or rape, by fine of not more than $3,000 or imprisonment for not more than ten years, or both.

(c) Assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by fine of not more than $1,000 or imprisonment for not more than five years, or both.

(d) Assault by striking, beating, or wounding, by fine of not more than $500 or imprisonment for not more than six months, or both.

(e) Simple assault, by fine of not more than $300 or imprisonment for not more than three months, or both.

26. Under the same rationale, Shaw also asserts that he should not have been given a consecutive sentence for Count Five (use of a firearm to commit assault), and Count Three, use of a firearm to commit murder) because there was only a single carrying and use of a firearm.

It is enough if there is one element required to prove the offense charged in one count which is not required to prove the other. *United States v. Cantu,* 557 F.2d 1173, 1176 (5th Cir.), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1977). A conviction for murder under 18 U.S.C. § 1111 requires a killing of a human being with premeditation and malice aforethought. Obviously, there is no requirement of a killing or premeditation to support a conviction for assault. Here Shaw is charged under two discrete federal statutes with causing two distinct types of harm to two different persons. As we stated in *United States v. Rodriguez,* 585 F.2d 1234, 1249 (5th Cir.1978), *rev'd on other grounds,* 612 F.2d 906 (1980) (en banc), *aff'd sub nom. Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), "a person who fires one bullet and kills two different persons has wrought two distinct social harms, and society may punish both." Shaw's conviction on both counts was proper.

### VII. CONCLUSION

Few trials can be conducted without the possibility of some technical error. However, the law does not guarantee a perfect trial, only a fair one. *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953); *United States v. Evans,* 572 F.2d 455, 491 (5th Cir.) *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978). We have carefully considered both the record and the briefs submitted by counsel, and we are convinced that the defendant did receive a fair trial. Accordingly, the judgment of the district court is

AFFIRMED.