**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**PATRICK PETROLEUM CORPORATION OF MICHIGAN, Charles Douglas Robinson, Defendants-Appellants.**

No. 81–2312.

United States Court of Appeals,
Fifth Circuit.

Sept. 24, 1982.

John J. Privitera, Washington, D.C., for Patrick Petroleum.

Michael E. Tigar, Washington, D.C., for Robinson.

Carl Walker, Jr., U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., for United States.

Before THORNBERRY, REAVLEY and GARWOOD, Circuit Judges.

REAVLEY, Circuit Judge:

Appellants were convicted of mail fraud and conspiracy to commit mail fraud. 18 U.S.C. §§ 371, 1341. Their appeal argues that their knowledge of and participation in the fraudulent scheme was not proved, that co-conspirator statements were admitted against them without the *James*[1] predicate, and that the mailings were only collateral or incidental to the scheme. We affirm.

The fraudulent scheme was: to obtain from a corrupt employee valuable confidential geophysical information of Union Oil Company of California—to obtain mineral leases in areas of Mississippi thereby disclosed to be valuable to Union, which Union wanted to lease for itself and which it planned to develop, and which lands were disclosed to have high potential for gas or oil production—to profit from production and from resale of part interest in the acquired leases to Union. The scheme involved the use of the mails to facilitate the acquisitions and to transmit statements and payment to lease brokers and a co-conspirator, to obtain charges from lease brokers who were acquiring the leases in Mississippi, to propose the resale to Union and to obtain follow up consideration within Union's ranks, all for the purpose of executing the scheme.

Appellants are Patrick Petroleum Corporation of Michigan (Patrick), an independent oil company with a branch office in Houston, and Charles D. Robinson, Patrick's vice-president in charge of its lands division. Coindictee Ronald Meeks, the Patrick landsman in Houston, was granted a severance. Coindictee William Kent, a Houston oil broker, was a fugitive. Coindictee Lauren Smith, the former Union employee, pleaded guilty to one count and testified for the government.

---

1. *United States v. James,* 590 F.2d 575 (5th Cir.), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

The case has been here before. The district court originally dismissed all counts of the indictment on the ground that the mailings alleged were remote from the misappropriation of the Union data and the defalcation of the Union employee. We reversed and sent the case back for trial. *U.S. v. Kent,* 608 F.2d 542 (5th Cir.1979).

### A. Sufficiency of the Evidence

■ Smith, senior draftsman for Union, testified that he violated his obligation to his employer by taking confidential maps and documents from Union's Houston offices and selling them to Kent. The information transmitted had been developed by Union at substantial expense and disclosed particular prospects or areas in Mississippi where mineral deposits were thought by Union experts to exist. The information was passed on to Patrick. The evidence tending to prove that Patrick, through its vice-president Robinson and its area landsman Meeks, knew that the information was confidential property of another, acquired by fraud, is as follows:

1. Robinson placed a high value upon the information that came from Kent, who was just a trader, not a geologist or engineer. Robinson authorized a large lease acquisition activity in the precise areas of Union interest. More than a quarter of a million dollars was spent there, and Kent was paid $10 an acre ($23,580 in all) and given an overriding interest in all mineral acreage leased by Patrick.

2. The decision by Robinson to move on the Mississippi program came shortly after a meeting in Kent's apartment, which he and Meeks attended, on June 30, 1975.

3. The relationship with Kent was concealed. The Patrick geologist in its Houston office was never informed or consulted about the Mississippi program. The checks and mineral interest assignments to Kent were in the names of "Harold Gray" and "J.J. Paul" and were hand delivered by Meeks to Kent. The name of the true beneficiary of these payments and assignments, though known to Robinson, was never reflected on Patrick records. The only place Kent's name shows up is on a few expense account notations by Meeks.

4. Robinson had in his files a clearly marked Union map, showing the accurate site discussed within Union offices for a well location, attached to a "confidential" memorandum dated February 18, 1977 from Kent giving information on Union's plans and admonishing him to "be careful." Kent says: "The location on Sellers [Union prospect name] was decided on last Monday" and "when you make a deal with Union on Sellers" send a copy through Meeks. The memo concluded: "Best, Bill."

5. Smith testified that Kent told him of a meeting in Kent's apartment when he showed the maps to some big oil company men, including a large red headed man. Robinson is a large red headed man.

6. Watzlavick, a geologist who reproduced for Kent Union maps without the Union name, testified that Kent told him that Patrick was considering the Mississippi acreage and, on July 7, 1975 was told that Patrick would lease to the extent of $250,000 in the Mississippi area, paying Kent $10 an acre up to $240,000 and thereafter $5 per leased acre, with a 5½ percent override.

7. One of the Union maps, with the Union name on it, which was taken from Kent's office in the execution of a search warrant, had a fingerprint on it proved to be that of Meeks.

Robinson testified that the Mississippi prospects were not mentioned in the meeting at Kent's apartment, that later he approved a leasing program to spend from $25,000 to $75,000 there, that additional expenditures were to depend upon what was learned on the ground after activity there began. This is inconsistent with the size of Patrick's program that began by July 4 or 5 when an Oklahoma broker was called by Meeks to go to Mississippi, along with two other brokers in his employ, to begin work. On July 9 the Oklahoma broker obtained a current ownership map of the general area and was shown by Meeks exactly what locations were desired, locations that were based on the information obtained by Meeks from Kent. On July 15 the same

broker offered in writing to lease from a Mississippi landowner 4320 acres at $25 an acre, which would have required the payment of $108,000. Robinson sent his brother to Mississippi on July 9 and testified that he did so because "there was no way three or four brokers could handle" the job.

Appellants purport to explain their reliance upon Kent's information by saying they confirmed the geology of the Mississippi acreage with an expert named Richard Winborn. But Winborn stated that the contact with him was a routine encounter when he gave Meeks information available to the public revealing only the general trend in the area, and that his (Winborn's) employer would not have bought large tracts of land based on that extent of information.

On this record a reasonable trier of fact could find, beyond a reasonable doubt, that Robinson knew that Kent obtained the maps and information by fraud, and that Robinson and Meeks and Patrick joined the scheme as alleged in the indictment. *See United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982).

### B. Co-Conspirator Hearsay Statements

Some of the evidence stated above came from extrajudicial statements by coconspirator Kent. Appellants contend that the requirements of *James* were not met. We disagree.

The trial judge held an independent hearing prior to trial. At the conclusion of that hearing, where the evidence was in accord with what is outlined above, the judge determined that the *James* initial requirement was satisfied, that is: there was substantial evidence, aside from the extrajudicial statements, of a conspiracy between the declarant and one or more of the defendants and that the statements were in furtherance of the conspiracy. At the close of the Government's case, appellants renewed their *James* motion, arguing that the Government had not shown by a preponderance of the evidence that appellants were members of a conspiracy with Smith or Kent. The judge overruled the objection, and the evidence supports that ruling.

### C. Relation of the Mailings to the Fraudulent Scheme

Appellants argue that the elements of mail fraud set out in the first appeal, see *Kent,* 608 F.2d 545, were not met because the proof does not show that the mailings were made for the purpose of executing the scheme. This court there stated that the "requisite statutory purpose exists if the alleged scheme's completion could be found to have been dependent in some way upon the information and documents passed through the mails." 608 F.2d 546. The trial judge instructed the jury as follows:

The alleged scheme must be proven beyond a reasonable doubt to depend on (sic) some way on the mailings for completion or its fruition. If you find the Government has not proved beyond a reasonable doubt that the mailings were an integral part of the alleged scheme and artifice to defraud and not merely collateral or incidental, you must acquit the defendants.

The scheme of these defendants was to obtain profitable leases by the use of the confidential information in order to profit from mineral production and by resale of the leases to Union. The brokers, working in Mississippi, used the mails as an incident to the purchase of these leases. Mailings made by Union during its consideration of Patrick's offer were incident to part of the scheme. The mailings between Meeks and the Michigan office were the means by which the program was planned and financed. It is not necessary to prove that use of the mails, rather than private messenger or other means, was essential, or that the scheme could not have succeeded but for the mailings. Use of the mails would be foreseen and expected in the completion of the scheme of appellants, and they did in fact use or cause to be used the mail in the execution of that scheme. The requirements of proof stated by this court in our former decision were met.

### D. The Sentence

The Government asserts that the district court's sentence should be clarified. No one

disputes that the judge intended to suspend imposition of prison term, place Robinson on probation for two years, and fine him $10,000. The judgment and commitment order, however, reads:

Imposition of sentence is suspended ... as to Counts 1 through 13, 15, 16, and 17, all counts to run concurrent to each other. As to Count 17, a fine of $10,000 is assessed....

The hearing transcript is generally in accord, although it can be read to mean that $10,000 concurrent fines were imposed on all counts. The maximum fine under 18 U.S.C. § 1341, however, is $1,000.

█ The Government argues that the sentence is internally inconsistent: it first suspends imposition of sentence and then imposes a fine. Further, the Government predicts double jeopardy complications should Robinson pay the fine and then violate probation and the trial court impose a prison term. Because the sentencing transcript reflects the same inconsistency as the written order, Fed.R.Crim.P. 36, which governs clerical errors, is not an appropriate vehicle for clarification.

█ The sentencing court has an obligation to express its sentences in clear terms to "reveal with fair certainty" its intent and to "exclude any serious misapprehensions by those who must execute them." *United States v. Daugherty,* 269 U.S. 360, 363, 46 S.Ct. 156, 157, 70 L.Ed. 309 (1926). In *United States v. Moss,* 614 F.2d 171, 174–77 (8th Cir.1980), the Eighth Circuit construed *United States v. Daugherty* to require resentencing where a sentence was susceptible to various interpretations and internally self-contradictory. Although an unclear or ambiguous sentence may be an illegal sentence susceptible to a motion pursuant to Fed.R.Crim.P. 35(a), *see Benson v. United States,* 332 F.2d 288 (5th Cir. 1964); *Scarponi v. United States,* 313 F.2d 950, 953 (10th Cir.1963), it is in the interest of judicial economy and fairness to all concerned parties that we remand for clarification of the sentence at this time.

The convictions of both appellants are AFFIRMED on all counts. Appellant Rob-

inson's sentence is VACATED and the case REMANDED to the district court for resentencing.