**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Rollie BLANKENSHIP,
Defendant-Appellant.**

**No. 84–1193
Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Oct. 29, 1984.
Rehearing and Rehearing En Banc Denied
Dec. 4, 1984.

John Tatum, Dallas, Tex., for defendant-appellant.

James A. Rolfe, U.S. Atty., Fort Worth, Tex., Christopher Lee Milner, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before RUBIN, RANDALL and TATE, Circuit Judges.

PER CURIAM:

Rollie Blankenship appeals his conviction on five counts of mail fraud under 18 U.S.C. § 1341. He attacks the sufficiency of the evidence to support his conviction, the propriety of the court's instructions to the jury and the overruling of his objection to a Government question propounded to him during cross-examination. Finding no reversible error in the proceedings below, we affirm.

### I.

Rollie Blankenship (Blankenship) was charged in seventeen counts of a twenty-count indictment alleging that he and several others committed mail fraud by submitting bogus insurance claims for the theft of non-existent machinery. Following dismissal of part of the indictment, a jury convicted Blankenship of five counts of mail fraud and acquitted him of three others. The five counts on which he was convicted all relate to a scheme through

which Marvin Lovell (Marvin), with the help of his brother, Roger Lovell (Roger), Wade Hopkins (Hopkins) and Blankenship, attempted to procure funds needed to pay Marvin's income taxes. Marvin, Roger and Hopkins were also indicted but all three negotiated plea agreements with the Government and testified against Blankenship.

The background and particulars of the fraudulent scheme, as revealed through the testimony of Marvin, Roger and Hopkins, can be summarized as follows: Marvin told Blankenship, who was both a friend and a vice president at a local bank, that he owed $19,000 in taxes which he did not have. Blankenship responded by proposing a scam to defraud an insurance company through which Marvin might realize enough to keep the IRS off his back. He suggested the following: Blankenship would authorize a loan from his bank to Marvin for the avowed purpose of purchasing a piece of construction equipment. No equipment would be purchased, however, and, after reserving enough to make one or two loan payments, Marvin and Blankenship would split the bank's money. Marvin would simply supply the bank with a bogus serial number for a non-existent machine and insure the phantom machine against theft. After making one or two payments, Marvin would report the machine stolen, collect the insurance proceeds and use them to continue payments on the loan.

Marvin agreed to the scheme and solicited the help of Roger and Hopkins. Marvin and Blankenship located some equipment for sale in a construction magazine, altered the serial number slightly, and submitted the phony documentation to the bank. Blankenship provided Marvin with a blank bill of sale which Hopkins filled out and signed as the purported seller of the equipment. Blankenship authorized a loan of $36,000 to Marvin and had four checks drawn on the bank for $9,000 each. Marvin and Hopkins endorsed and cashed the checks and delivered about half of the money to Blankenship. About two months later, Roger reported to the police that the equipment had been stolen and Marvin sub-

mitted a claim to his insurance company. The altered serial number tipped the insurance company off, however, and it ultimately unearthed the scam and denied the claim.

Blankenship testified at trial and vigorously denied this version of the story. He claimed that, so far as he knew, the loan to Marvin was a bona fide business deal which he authorized because of Marvin's good credit and reputation at the bank. He supported his account of the facts by testifying that he had actually inspected the equipment for which the loan was made while it was stored in a hotel parking lot.

 The mail fraud statute, 18 U.S.C. § 1341, makes it unlawful to use the United States mail for the purpose of executing a scheme or artifice to defraud. Each separate use of the mail in furtherance of such a scheme constitutes a separate crime. *United States v. Shaid*, 730 F.2d 225 (5th Cir.1984). Counts one through five of the indictment allege Blankenship's involvement in the following separate offenses: (1) the mailing of a copy of the bank promissory note to the insurance company; (2) the mailing of a copy of the phony bill of sale to the insurance company; (3) the mailing by the insurance company of a blank proof of loss form to Marvin; (4) the return of the executed proof of loss form to the insurance company; and (5) the mailing of the police incident report to the insurance company. The indictment alleges that, with respect to each of the five mailings, Blankenship violated the mail fraud statute as well as the aiding and abetting statute, 18 U.S.C. § 2. From his conviction on all five counts, Blankenship appeals.

## II.

### IMPROPER IMPEACHMENT

Blankenship argues on appeal that the district court erroneously allowed the Government to comment during impeachment on his exercise of the fifth amendment privilege against self-incrimination. This argument lacks merit. Blankenship

elected to testify at trial and stated, in direct contradiction to Marvin's testimony, that he had no knowledge that the loan transaction was a scam, that he authorized the loan on the strength of Marvin's credentials at the bank and that he actually saw a piece of equipment that he was led to believe was the collateral for the loan and later the subject of the insurance claim.

On cross-examination, the Government asked the following question: "Now, today was the first time that your account of what happened was heard by anybody involved in law enforcement, isn't it?" Record Vol. IV at 410. Blankenship was directed to answer the question over his counsel's objection and responded affirmatively. He went on to explain, however, that he had been contacted by a postal inspector and had expressed his willingness to talk but, for some unexplained reason, the discussion never occurred. *Id.* at 412–13.

Blankenship objected to the question on the ground that it constituted an impermissible comment on his exercise of the fifth amendment privilege against self-incrimination. *Id.* at 410. On appeal, he relies on a series of cases that deal with the propriety of prosecutorial reliance on post-arrest or post-*Miranda* silence to rebut an exculpatory story told by the defendant at trial. In *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), the Supreme Court, without reaching the constitutional question, exercised its supervisory authority over lower federal courts to prohibit cross-examination of a defendant with respect to post-arrest silence. One year later, the Court held in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), that cross-examination of a defendant with respect to post-arrest silence, offered on the theory that silence is inconsistent with an exculpatory story told at trial, deprives the defendant of the fundamental fairness guaranteed by the due process clause. That conclusion is bottomed on the insoluble ambiguity of post-arrest silence that necessarily results when a defendant has been read his *Miranda* rights; the defendant's silence may well indicate, not

that he has no exculpatory story to tell, but that he is simply exercising the rights of which he has just been advised. In *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam), the Court expressly limited *Doyle's* holding to silence occurring after *Miranda* warnings.

In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), however, the Court held that impeachment of a testifying defendant by reference to his prearrest silence is not unconstitutional. By offering himself as a witness, the Court held, defendant waives his fifth amendment privilege and may be cross-examined with respect to his credibility to the same extent as other witnesses. The Court further held that allowing cross-examination to extend to prearrest silence does not impermissibly burden the exercise of fifth amendment rights; defendant makes a tactical decision to testify and must then accept the prosecutor's right to examine his credibility. Finally, the Court distinguished *Doyle* and found that allowing impeachment through prearrest silence does not offend due process guarantees; when prearrest silence is involved, "no governmental action [has] induced [the defendant] to remain silent," *id.* at 240, 100 S.Ct. at 2130, and it is not, therefore, fundamentally unfair to ask why he did not offer his exculpatory story at an earlier point in time.

■■■ *Jenkins,* of course, deals strictly with the constitutional issues involved in impeachment with prearrest silence. *Id.* at 240, 100 S.Ct. at 2130 ("Each jurisdiction remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative than prejudicial."). The Court has not pronounced a general supervisory rule for federal courts with respect to prearrest silence. *But cf. United States v. Hale,* 422 U.S. at 171, 95 S.Ct. at 2134 (supervisory rule for post-arrest silence). At trial, however, Blankenship's objection to the Government's question raised only the constitutionality of the impeachment tech-

nique. Therefore, we are not called upon to evaluate whether the question was objectionable under any specific rule of evidence.[1] If the Government's question relates to prearrest silence, the constitutional claim is without merit; if it relates to postarrest silence, there has been a constitutional violation which we will evaluate under the harmless error standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1976). *See, e.g., Chapman v. United States*, 547 F.2d 1240, 1248 (5th Cir.) ("We agree ... that the harmless error doctrine is applicable to the kind of constitutional violation at issue in *Doyle*."), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977).

 Blankenship was arrested on September 1, 1983, and made an initial appearance before a magistrate at 4:45 p.m. on the same day. Record Vol. I (docket sheet). The Government's question on its face is sufficiently broad to encompass silence both before and after September 1. While we have held that "virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a *Doyle* violation," it is clear that a prosecutor's question must be evaluated in context. *United States v. Shaw*, 701 F.2d 367, 381–82 (5th Cir.1983), *cert.*

*denied*, —— U.S. ——, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). As we said in *Shaw*:

The alternative tests for determining whether a prosecutor's or witness's remarks constitute comment on a defendant's silence are whether the "manifest intent" was to comment on the defendant's silence or, alternatively, whether the character of the remark was such that the jury would "naturally and necessarily" construe it as a comment on the defendant's silence. Both the intent of the prosecutor and the character of the remarks are determined by reviewing the context in which they occur, and the burden of proving such intent is on the defendant.

*Id.* at 381 (citations omitted).

From the context of the Government's question in this case, we are convinced that these tests have not been met. During its case in chief, the Government bolstered its theory that Blankenship was a participant in the fraudulent scheme by eliciting testimony concerning attempts by Marvin and Blankenship to cover up the scheme and thwart the insurance company's investigation. For example, Marvin testified that he and Blankenship discussed a phony story to tell the insurance investigator. Marvin also testified that, four months before the indictment in this case was filed, a postal

---

1. Blankenship's brief on appeal contains some ambiguous language that might be read to attack the Government's question on general relevance grounds. *See* Fed.R.Evid. 401, 403. Even if Blankenship intends to raise relevance on appeal, we of course are limited, by his failure to object at trial on that ground, to the plain error standard of review. *See United States v. Arteaga-Limones*, 529 F.2d 1183, 1198–99 (5th Cir.) (limit review of evidentiary rulings to grounds asserted in contemporaneous objection), *cert. denied*, 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 286 (1976); *see also* Fed.R.Crim.P. 51, 52(b). Relevance questions, of course, are committed to the broad discretion of the trial court. We discern no plain error in allowing the Government to ask the question about Blankenship's failure to come forward with his version of the story. *Cf. United States v. Nabors*, 707 F.2d 1294, 1298 (11th Cir.1983) (fifth amendment objection to evidence of defendant's silence, no plain error on relevance grounds), *cert. denied*, —— U.S. ——, 104 S.Ct. 1271, 79 L.Ed.2d 677 (1984).

Blankenship also claims for the first time on appeal that the Government's question violated Fed.R.Evid. 608. Again, this claim was not made at trial and does not convince us that plain error occurred. We simply note that defendant's reliance on Rule 608 is misplaced. Rule 608(b) provides, in pertinent part: "The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility." The purpose of this part of Rule 608 is to make clear that, while a witness' credibility may be attacked on cross-examination by reference to specific instances of conduct probative of the witness' character for truthfulness, a witness may nonetheless invoke the fifth amendment privilege and refuse to answer questions about *past* conduct. Fed.R. Evid. 608 advisory committee note. The rule has nothing to do with the scope of a testifying defendant's waiver of the privilege with respect to the crime with which he is charged. *Id.*

inspector contacted him to discuss the insurance claim. Marvin discussed the postal inspector's visit with Blankenship and testified that Blankenship said he would not speak with the inspector. Record Vol. III at 104–13. The record is absolutely clear that the episode with the postal inspector, which was presumably offered to show that Blankenship participated in a cover-up and, by necessary implication, was aware that a bogus insurance claim had been made, occurred prior to the arrest or indictment of either Marvin or Blankenship and at a time when neither was in custody. There is absolutely no indication in the record that either Marvin or Blankenship had received *Miranda* warnings at this time.

■ We think that the Government's question about Blankenship's silence was directed to this prearrest contact with the postal inspector. In response to Blankenship's objection, the Government argued to the court that the question was proper because it related to the preindictment, prearrest contact with the postal inspector about which Marvin had already testified. Record Vol. IV at 411. In fact, Blankenship's response to the question indicates that he understood it to relate to that incident. He testified, again in direct contradiction to Marvin's testimony, that he was contacted by the postal inspector and was willing to discuss the bank's loan to Marvin with him. *Id.* at 412–13.

Obviously, our concern in *Doyle* cases is with the effect that Government comments or questions may have on the jury. *See, e.g., United States v. Smith,* 635 F.2d 411, 413 n. 4 (5th Cir.1981). We are convinced that the Government did not intend to comment on Blankenship's post-*Miranda* silence and that Blankenship's response to the Government's question did not draw the jury's attention to post-*Miranda* silence. *See United States v. Riola,* 694 F.2d 670 (11th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 118, 78 L.Ed.2d 117 (1983).

Therefore, no constitutional violation occurred.

## III.

## JURY INSTRUCTION

■ Blankenship next argues that the court's instructions to the jury on the elements of a mail fraud conviction were fundamentally flawed. Since Blankenship did not raise his objection to the charge at trial, *see* Record Vol. V at 426, 478, we can only reverse for plain error "so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings and result in a miscarriage of justice." *United States v. Adkins,* 741 F.2d 744, (5th Cir. 1984) (quoting *United States v. Howton,* 688 F.2d 272, 278 (5th Cir.1982)). Of course, in reviewing the charge for plain error, we must consider the court's instructions as a whole. *United States v. Thevis,* 665 F.2d 616, 645 (5th Cir.), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982).

Blankenship complains that the following paragraph of the court's charge is plainly erroneous:

> What must be proved beyond a reasonable doubt is that some person or persons knowingly and willfully devised or intended to devise a scheme to defraud substantially the same as the one alleged in the indictment; and that the use of the U.S. mail was closely related to the scheme in that some person or persons either mailed something or caused it to be mailed in an attempt to execute or carry out the scheme. To "cause" the mails to be used is to do an act with knowledge that the use of the mails will follow in the ordinary course of business or where such use can reasonably be foreseen.

Record Vol. I at 124.

■ Blankenship's principal objection[2] to this paragraph is that it refers generally

---

**2.** Blankenship also argues that the instruction refers to the "U.S. mail" rather than the statutory language "post office or authorized depository for mail matter." This objection is absolutely frivolous and need not detain us. We simply note that (1) earlier in its instructions the court

to "some person or persons" rather than to the defendant or someone acting with the defendant.

 Although this claim is not well-developed in his brief, Blankenship apparently complains that the court confused the instruction on aiding and abetting liability with the instruction on liability for the crime of mail fraud itself. The aiding and abetting statute, 18 U.S.C. § 2, makes any one who "aids, abets, counsels, commands, induces or procures" the commission of a crime punishable as a principal. It is of course necessary that "some person or persons" have committed all elements of the crime before another can be guilty as a principal for aiding and abetting under 18 U.S.C. § 2. Of course, a party may be guilty of mail fraud itself, without regard to 18 U.S.C. § 2, even though he has not actually used the mail himself: it is sufficient if he has (1) devised a scheme to defraud and (2) for the purposes of executing the scheme, "knowingly cause[d] [an article] to be delivered by mail," 18 U.S.C. § 1341. One "causes" an article to be delivered by mail if he acts with the knowledge that use of the mail will follow in the ordinary course or if use of the mail is reasonably foreseeable, even though not actually intended. *See, e.g., United States v. Kenofskey*, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836 (1917).

 Counts one through five of the indictment allege that Marvin, Roger, Hopkins and Blankenship all knowingly caused the illegal mailings in violation of 18 U.S.C. § 1341, and, alternatively, that all are criminally liable for the same mailings under 18 U.S.C. § 2. We find no fundamental error in the court's instructions with respect to criminal liability under either statute.

The court's instructions address mail fraud first and, in a subsequent section, deal with aiding and abetting liability. The confusion which Blankenship apparently complains of arises because initially the court instructed that the jury must find

that "Defendant" knowingly caused an item to be mailed for the purpose of executing the scheme. Record Vol. I at 122. Later on, however, in the paragraph quoted above, the court instructed that the Government must prove that "some person or persons" devised a scheme and knowingly caused a mailing. Finally, in its aiding and abetting instruction, the court stated that "you may not find the defendant guilty unless you find beyond a reasonable doubt that every element of the offense ... was committed by some person or persons, and that the defendant willfully participated in its commission." *Id.* at 126.

We note that the instructions might have been clearer if the court had not utilized the "some person or persons" language in the discussion of mail fraud itself but saved it instead exclusively for the aiding and abetting instruction. We reject, however, the claim that is implicit in Blankenship's arguments: that the instruction allowed the jury to convict Blankenship for the crimes of others. Viewed as a whole, the charge adequately informed the jury that, in order to convict Blankenship, they must find that he devised a scheme to defraud and, to execute the scheme, knowingly caused each of the five mailings to occur or, though he may not personally have done all of those things, he willfully aided and abetted another in accomplishing them. The charge correctly made clear that, whether conviction was based on the mail fraud statute or the aiding and abetting statute, it was not necessary to find that Blankenship himself made the mailings. *See* part IV, *infra.* In short, we find no plain error in the court's instructions.

## IV.

## SUFFICIENCY OF THE EVIDENCE

Finally, Blankenship argues that the evidence is insufficient to support his conviction for mail fraud because (1) his convic-

quoted verbatim the language of the statute referring to the post office and (2) Blankenship himself submitted a nearly identical proposed

instruction that referred to the U.S. mail in the same manner as the court's instruction. Obviously, no plain error occurred in this regard.

tion is based solely on the uncorroborated testimony of his alleged accomplice, Marvin, and (2) the evidence shows that the mailings were not made during the alleged scheme to defraud and were neither an integral part of the alleged scheme nor contemplated by Blankenship.

We must sustain the jury's verdict in this case "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The verdict may stand, even if the only evidence to support it is the uncorroborated testimony of an accomplice, as long as the testimony is not incredible or insubstantial on its face. *United States v. Moreno*, 649 F.2d 309, 312 (5th Cir.1981).

Blankenship's sufficiency of the evidence points are without merit. At the outset, we note that the jury was properly cautioned to carefully consider the testimony of Blankenship's alleged accomplices. Record Vol. I at 130. *See, e.g., United States v. Johnson*, 553 F.2d 901, 903 (5th Cir.1977). Although Roger testified vaguely that he knew of Blankenship's involvement in the scheme, Record Vol. III at 169, we agree with Blankenship that his connection with the fraudulent scheme rests primarily on Marvin's testimony. We cannot say, however, that Marvin's testimony is incredible or insubstantial on its face. Although he could not recall the details of some of his conversations with Blankenship, he testified unequivocally that (1) Blankenship proposed the scam and knew that the machine did not exist; (2) he helped Marvin use a construction magazine to find an appropriately priced machine to supply bogus information for the bank, Record Vol. III at 90; (3) Blankenship altered its serial number and supplied Marvin

with a blank bill of sale, *id;* (4) Blankenship approved the loan and caused the money to be paid in four checks of $9,000 each to avoid IRS reporting requirements, *id.* at 93; (5) Blankenship received approximately $16,500 of the loan proceeds, *id.* at 95; (6) Blankenship helped Marvin decide when to report the machine stolen, *id.* at 97; (7) Blankenship put pressure on the insurance company to pay the claim, *id.* at 104; and (8) Blankenship and Marvin together dreamed up a story to tell the insurance investigator about viewing the machine at a hotel parking lot, *id.* at 105.

The only evidence directly contradictory to this version of the story was Blankenship's own testimony.[3] With respect to Blankenship's involvement in the scheme, the jury was left with a swearing match between Marvin and Blankenship. The jury resolved the credibility question against Blankenship, and we are not in a position to reexamine it. Although Blankenship offered witnesses attacking Marvin's credibility and bolstering his own, after a careful review of the record, we are left with the firm conviction that the jury's conclusion that Blankenship was a willing participant in the scheme is supported by substantial evidence.

Blankenship's claim that the evidence does not support the jury's verdict with respect to the relationship of the mailings to the scheme to defraud is also without merit. He argues (1) that the mailings did not occur during the scheme to defraud and (2) that the mailings were not in his contemplation nor an integral part of the scheme.

We note that, although use of the mail must be an integral part of the scheme to defraud, "[t]he requisite statutory purpose exists if the alleged scheme's

---

**3.** Blankenship did offer general testimony that it is not unusual to finance construction equipment without inspecting it, that construction machines do not have certificates of title and that one could easily remove a metal plate bearing the serial number from a machine and re-

place it with a bogus one. *E.g.*, Record Vol. IV at 302–04. He also offered testimony that it is not unusual for banks to pay loan proceeds in the manner requested by the customer. *Id.* at 333.

completion could be found to have been dependent in some way upon the information and documents passed through the mails...." *United States v. Kent*, 608 F.2d 542, 546 (5th Cir.1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980). A mailing is an integral part of a scheme to defraud if "the thing mailed was an integral part of execution of the scheme," *id.*; "[i]t is not necessary that the scheme contemplate the use of the mail [itself] as an essential element." *United States v. Murphy*, 703 F.2d 1335, 1338 (5th Cir.1983) (quoting *United States v. Crockett*, 534 F.2d 589, 593 (5th Cir.1976)).

■■■ Therefore, it is irrelevant that Blankenship himself did not contemplate that the mail would be used in the fraudulent scheme. The evidence is undisputed that the insurance company required a copy of the promissory note, the bill of sale and the police incident report before it could process Marvin's claim. The material sent by mail, therefore, was integral to the execution of the scheme. The fact that it could have been delivered to the insurance company by some other means is, of course, irrelevant. *See, e.g., United States v. Patrick Petroleum*, 703 F.2d 94 (5th Cir.1982). The evidence also supports the conclusion that Blankenship knowingly caused the mailings to be made; in fact, he actually mailed the insurance company a copy of the bill of sale himself. The evidence was clear that it was reasonably foreseeable that the other mailings would be made. Finally, Blankenship's claim that the mailings did not occur during the scheme to defraud is not explained in his brief and is absolutely meritless.

## V.

## CONCLUSION

After a careful review of Blankenship's claims, we find no basis for reversing his conviction.

AFFIRMED.